[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-10606

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 21, 2007
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-00505-CV-FTM-29-DNF

MICHELLE GOEBERT,

Plaintiff-Appellant,

versus

LEE COUNTY, a political
subdivision of the State of Florida,
LEE COUNTY SHERIFF'S OFFICE,
THOMAS P. WEAVER, individually
and as Captain of Lee County Sheriff's
Office,
PRISON HEALTH SERVICES, INC.,
a foreign corporation,
EMSA CORRECTIONAL CARE, INC.,
a Florida Corporation, et al.,

Defendants-Appellees,

RODNEY SHOAP,
individually and as Sheriff
of Lee County,

Defendant.

Appeal from the United States District Court
for the Middle District of Florida

————————————————

**(December 21, 2007)**

Before CARNES, WILSON and HILL, Circuit Judges.

CARNES, Circuit Judge:

On November 30, 2001, Michelle Goebert, a pregnant inmate in Lee County, Florida, was taken from jail to the hospital because she had been leaking amniotic fluid for eleven days. Two days later her fetus' heartbeat stopped, doctors induced labor, and the child was stillborn. Goebert filed a 42 U.S.C. § 1983 action against the county's sheriff, the jail facility commander, the jail doctor, and the jail's medical service provider, alleging deliberate indifference to her serious medical needs in violation of the Eighth and Fourteenth Amendments.

The district court granted summary judgment to all of the defendants based on Goebert's failure to exhaust her administrative remedies as required by the Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e(a). It also ruled alternatively that the sheriff and jail facility commander were entitled to summary judgment on the merits. This is Goebert's appeal from all aspects of the final judgment.

# I.

The following are the facts viewed in the light most favorable to Goebert, which is how we are required to view them at this stage of the proceedings. See Tinker v. Beasley, 429 F.3d 1324, 1326 (11th Cir. 2005) (per curiam); Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003).

On April 27, 2001, Goebert killed someone in Florida while driving under the influence (of what, the record does not say). She fled to Canada where she was arrested on a Florida warrant. Canadian authorities detained Goebert for a month and a half before returning her to Florida.

While in Canadian custody, Goebert discovered that she was pregnant with her fiancé's child. She had been pregnant twice before, but both pregnancies ended in miscarriages—the first after her former husband threw her down a flight of stairs, and the second after she had been lifting heavy objects at work. While in the Canadian jail, Goebert received an ultrasound, was provided with access to a clinic that monitored her health and that of her child, and visited a doctor four or five times.

After waiving extradition, Goebert was returned to the United States and taken to jail in Lee County, Florida. When admitted to the jail on October 19, 2001, she met with the jail medical staff and told them that she was pregnant and

3

had a high risk of miscarriage because of her age, Rh-negative blood, and history of miscarriages. Although Goebert asked the staff to get her medical records from the Canadian jail, they did not do so. Shortly after her arrival, Goebert herself attempted to get her medical records by writing to the Canadian jail where she had been held, but did not succeed.

The Lee County jail staff neither asked Goebert to sign any intake documents, nor explained to her the procedures for obtaining healthcare. Inmates are supposed to receive a copy of the Inmate Rules Orientation & Information Handbook, which includes the administrative procedures for requesting medical care and lodging grievances. During her deposition, Goebert testified that she did not believe that she had received a copy of the Inmate Handbook.

Healthcare at Lee County Jail is contracted out to EMSA Correctional Care, Inc., a subsidiary of Prison Health Services, Inc. EMSA employs a Health Services Administrator, who is responsible for the medical service staffs at the jail facilities in Lee County. It also employs a Regional Medical Director who, apparently, supervises the physician assigned to the Lee County Jail facilities.

Dr. David Brown was the only physician at the facility where Goebert was jailed during the relevant period. He was not employed by EMSA but instead

4

worked for another company that contracted his services as a physician to EMSA. Brown lacked the authority to send an inmate to the hospital immediately.

Because Goebert was pregnant, the jail medical staff prescribed her prenatal vitamins, extra milk at meals, and, about a month after her arrival, a lower bunk. Progress reports from this period indicate no problems with her pregnancy. EMSA approved an outside office visit to an OB/GYN for Goebert, during which she had a pap smear and was tested for venereal diseases.

Goebert's pregnancy was normal until November 19, 2001. On that morning she awoke to find that she was leaking a noticeable amount of fluid from her vagina, which she thought was amniotic fluid. Goebert waited for the jail nurses to arrive, which was usually around seven or eight in the morning, at which time she alerted them to her problem. The nurses took her to see Dr. Brown.

Dr. Brown took Goebert's blood pressure and told her that she was fine, although he did order an ultrasound for later that afternoon. Brown's notes from that visit read: "S[ubjective] - I think my water is broke and leaking 'I had a miscarriage before!' O[bjective] - noted 6 in[ch] square wettness [sic] in pants when getting up this A.M. [complains of] mild back discomfort[.] [N]o bleeding or cramping noted."

Following the ultrasound, which did not show any loss of amniotic fluid, Dr. Brown noted that there was "no drainage noted on pad [at that] time," but Goebert should "remain on bedrest." Despite what Brown's notes said, Goebert had never been on bedrest. Lee County Jail forbids a prisoner from lying down during daylight hours unless she receives a "lie-in pass" from a medical staff member. Goebert never did receive a lie-in pass.

The following day, November 20, Goebert again went to see Dr. Brown. His notes indicate that she reported tenderness in the upper right quadrant of her abdomen and was suffering pain there after she ate. The notes also report his impression as: "? leakage of amniotic fluid" with "no treatment" but "cont[inued] observation." In responding to Goebert's concerns, Brown asked her how they could "be certain it was an amniotic leak? The baby could be tap dancing on [her] bladder." Goebert requested that an amniotic pH strip test be done, which would determine whether the fluid was in fact amniotic fluid. She was told, however, that one could not be done because it would require transporting her to the infirmary at the main jail facility. Brown also told Goebert that it was not an amniotic leak and they should just wait.

The next morning, November 21, Goebert again awoke to find that she had leaked fluid from her vagina. When the nurses came in, she told them that she was

continuing to leak and that it was getting worse. At this point, Goebert was soaking through a sanitary pad every few hours, but the nurses refused to take her to the doctor. The same thing happened every day for the next eight days. Some days the nurses would simply refuse to take her medical request forms. On November 24, a nurse just looked at her soaked sanitary pad and did nothing. Another time during this period one of the nurses wadded up Goebert's written request to see the doctor and threw it back at her. The nurses would also refuse to give her more medical request forms, telling her that she was "wasting [their] time," that they were already "aware of [her] problem," and that "there was 'nothing' wrong with [her]."

Goebert began seeking help from everyone with whom she had contact. In addition to the nurses, she spoke with three corrections officers between November 20 and 28. Sometimes the officers would give her medical request forms, but they did not allow her to lie down because of the jail's policy requiring lie-in passes to be signed by a member of the medical staff. Goebert also told her criminal attorney, other inmates, her fiancé, and her mother about the problems she was having. Although she leaked fluid every day during this eight day span, she was not taken to see a doctor.

On November 28, 2001, Goebert managed to submit another medical request form. It read: "I am 5 months pregnant & have been leaking a yellowish fluid since Sat. Nov 24/01. Since then I have been soaking a sanitary pad overnight. I have been informing Medical Staff of this since then & no one seems concerned. I would like to see a Doctor ASAP!" On that same day Goebert also sent a message to Thomas Weaver, the facility commander for the jail. The message was written on a form that had "request" and "complaint" at the top. There was an "X" marked next to "complaint." In the space provided for complaint, Goebert had written:

> I am 5 months pregnant & began leaking fluids on Nov. 19th. I was given an ultrasound that day & seen by the jail Doctor the following day, who told me I would be seen by an outside Dr., which I have NOT. I have continued leaking fluids, soaked a maxi-pad a day since Sat. Nov. 24th when it became worse. I have notified medical staff on a daily basis since then, but they seem unconcerned. I NEED to be seen by an obstetrician, not the jail Doctor. I lost a child at 5 months last year when my water broke early & NEED a doctor to let me know if everything is OK. I have not felt the baby move in a few days.

Goebert was told on November 28 that the next day she would finally be permitted to see Dr. Brown. The next day, however, she was told that her appointment with him had been cancelled.

On November 29, 2001, Goebert submitted another medical request form. This one said, among other things, that she had not felt the fetus move in days.

8

She also told one of the nurses that she "couldn't feel the baby kicking; that [she] feared the baby was dead; that [she] was still leaking fluids; [and] that [she] wasn't getting any assistance." After receiving Goebert's medical request, she was permitted to see the doctor and "[a]dvised to maintain bedrest until seen [b]y MD today." Again, because Goebert did not have a lie-in pass she was not permitted to lie down during the day.

Later that day a nurse administered a Doppler test to check the fetus' heartbeat. The test indicated normal fetal heart sounds. Goebert was then taken to see Dr. Brown. Despite "no noticeable baby movement," his impression was one of "normal baby activity [and] [heartbeat]." He nonetheless believed that Goebert should be referred to an outside obstetrician for a follow up visit. Brown faxed to EMSA a request for the referral. Four days later, on December 3, EMSA responded with a "Utilization Management Decision," finally permitting Goebert to receive outside medical help. By then it was too late.

November 30, 2001 was Goebert's thirty-ninth birthday. That morning she awoke to find that she still had vaginal leaking and it had gotten worse. She told the nurses. Then, suddenly, a rush of fluid came out of her, along with a large green blob. Goebert began screaming. She ran to the officer station, where the officers on duty told her that she was going to be taken to the hospital.

Goebert was left sitting up at the officer station for 25 minutes before an officer finally put her in the back of a car and began the drive to the hospital. About half an hour into the drive, when they had almost reached the hospital, the officer said "Oh no, I left your records behind." The officer then turned the car around and returned to the jail to get the records.

When they finally arrived at the hospital, the officer did not take Goebert to the emergency room. Instead, they sat down in a waiting room. Eventually, Goebert was taken to an examination room. When the hospital medical staff examined her, they discovered that she had too much fluid in her abdominal cavity. Through an ultrasound they discovered that there was essentially no amniotic fluid left in Goebert's womb.

Goebert was taken to the neonatal intensive care unit. There she was diagnosed as having suffered a premature rupture of membranes in her uterus, resulting in massive amniotic fluid loss and chorioamnionitis, a dangerous infection. The doctors explained to Goebert that she should have been on bedrest once she began leaking fluids, because lying down helps prevent fluid loss. The prognosis for the fetus was not good because Goebert had been leaking amniotic fluid for eleven days. During her three days in the hospital Goebert was not allowed to leave her bed, even to use the bathroom. She was also required to drink

10

large quantities of liquids, which the doctors hoped would help produce more amniotic fluid to replace what she had lost. Every hour doctors checked the fetus' heartbeat.

The fetus' heartbeat grew stronger, giving doctors reason to hope that it might live. They intended to begin a steroid regimen after a few more days in order to help build up the fetus' lungs. Goebert had been taken to the hospital too late to permit some other forms of treatment, such as sewing up her cervix to prevent further leaking. On December 2, 2001, a doctor came in to check the fetus' heartbeat and discovered that it had stopped. The doctor induced labor and Goebert gave birth to a stillborn girl.

Cassandra Garcia, a licensed midwife retained by Goebert, submitted a letter in conjunction with her affidavit stating that "[i]f Michelle Goebert would have received appropriate obstetrical care and treatment immediately upon complaining of signs and symptoms of preterm premature rupture of membranes, it is likely that she would not have developed the intrauterine infection, chorioamnionitis, and that the baby's chance of survival would have been significantly higher."

After Goebert was returned to Lee County Jail, she began experiencing bladder problems. She saw Dr. Brown, who looked at her records and suggested

that her pregnancy might be the cause. He then asked her how the child was doing.

On December 6, 2001, four days after her child was born dead, Goebert finally received Captain Weaver's response to her November 28, 2001 written complaint, in which she had described her medical problems and pleaded to see an obstetrician. Weaver's response, which was dated November 29, 2001, but was not delivered to Goebert until seven days later, said: "Medical can set up [an appointment up with an obstetrician] at your expense if you desire."

Captain Weaver's response was not an accurate statement of jail policy. The Health Services Agreement between Lee County and EMSA states that "EMSA will provide total medical prenatal care to any and all pregnant inmates/detainees" including "hospital admission of any inmate/detainee who, in the opinion of the EMSA Medical Director, requires hospitalization." Weaver did not contact the Medical Director about Goebert's problem. Under the jail's policy, the only time an inmate would have to pay for medical care would be if she insisted on care that the prison medical staff did not believe that she needed or if she insisted on a particular outside doctor or facility instead of the one chosen by the jail.

**B.**

12

The Inmate Handbook that prisoners at Lee County Jail are supposed to receive upon admission is intended to inform them of all the relevant policies and procedures at the jail. Section I, the "General" section of the Handbook, explains that "[o]ne aspect of being incarcerated is that you must follow the procedures set up for the overall operation of the facility."

Section I also contains a list of general principles designated by letter. Principles F and G read:

F    If a serious problem develops, do not attempt to solve it yourself. You should direct the problem to the on-duty detention officer, who is in a better position to help solve the problem.

G    If you need to discuss a problem with any member of the staff, a request form is provided for your use in requesting that staff member. The form should be requested from the officer on duty.

(original in upper case).

Subsection A of Section V, "Facility Services," is entitled "Medical and Dental Care." Relevant provisions include:

2.    In order to be seen by the medical staff, it is necessary for you to fill out a medical request slip. These slips can be obtained from the nurse. The medical staff will pick up these medical request slips. You are to retain the pink copy.

3.    In case of an emergency, you should notify the detention officer on duty. The officer will notify the medical staff and shift commander.

13

(original in upper case).

The portion of the Handbook informing inmates how to lodge a grievance is in the "Inmate Conduct and Discipline" section, and it is the only part of that section that does not deal with inmate discipline. It reads in its entirety:

F.     Inmate Grievance Procedure

    1.     A grievance is a formal complaint regarding a serious incident, policy or condition within the jail or regarding any staff member of the Lee County Sheriff's Office.

    2.     Most grievances can be handled quickly and easily by making the complaint known to the detention officer. If it becomes necessary, a written request (indicating "grievance") may be submitted. The form must contain the inmate's name and location and all the facts of the grievance including names and dates.

    3.     If the grievance cannot be handled by the on-shift supervisor, the grievance will be forwarded to the grievance committee after all facts have been searched or investigated. The grievance committee will notify the inmate of their findings.

Captain Weaver testified in his deposition that all inmates receive the Handbook. Goebert testified in her deposition that she believed she had never received one. There is no uniform time at which inmates receive the Handbook, and they are not asked to sign for them. There is nothing in the record to indicate that any attempt is made to explain the contents of the Handbook to the inmates.

14

In addition to the Handbook, the jail also has General Operating Procedures, which contain a section relating to inmate complaints. Inmate Grievance Procedure 4100-7B provides that if "an inmate [is] dissatisfied with the results of the grievance, an appeal of the findings may be made to the Detention Bureau Commander within five (5) days of receipt of the response." The General Operating Procedures are distributed to jail employees but not to inmates, and the parties agree that inmates would have no way of obtaining a copy of them.

## C.

On October 14, 2004, Goebert, who was at that time represented by counsel, filed this lawsuit in federal district court against Dr. Brown, facility commander Captain Thomas Weaver, nurse Sandee Malanoski, EMSA, Prison Health Services, the Sheriff of Lee County in his individual and official capacities, the Sheriff's Office, and Lee County itself. Goebert's second amended complaint included seven counts claiming violations of the Eighth Amendment's prohibition on cruel and unusual punishment and the Fourteenth Amendment and one count claiming negligence.[1] The nurse was later dismissed from the lawsuit because the time to serve her with process had expired. The individual capacity claim against

_____

[1] After the sheriff of Lee County at the time left office, he was replaced by the new sheriff, Mike Scott. The official capacity claim in the complaint was amended to reflect this change.

Rodney Shoap, who had been the Sheriff of Lee County during the relevant period, was also dismissed with prejudice. The remaining defendants then moved for summary judgment on the cruel and unusual punishment claims.[2]

The district court granted summary judgment to all of the defendants based on its conclusion that Goebert did not exhaust her administrative remedies as required by the Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e(a). As a backup ground for the Sheriff and the individual capacity claim against Weaver, the court also concluded that those two defendants were entitled to summary judgment on the merits.[3]

After Goebert, proceding pro se, appealed and filed a brief, we granted oral argument, appointed counsel to represent her, and requested supplemental briefing.

**II.**

---

[2] The district court dismissed the negligence and cruel and unusual punishment claims against Lee County, because it was not legally responsible for the jails, and the cruel and unusual punishment claims against the Lee County Sheriff's Office, because it was an improper defendant and the claims were time barred. Neither of these orders is contested in this appeal.

[3] The district court dismissed the official capacity claim against Captain Weaver because it was redundant of the official capacity claim against the sheriff. Goebert has not appealed this portion of the district court's ruling.

We begin with the district court's ruling that all of the defendants are entitled to summary judgment because Goebert failed to exhaust administrative remedies as required by 42 U.S.C. § 1997e(a).

## A.

The deficiency the district court found in Goebert's efforts was her failure to appeal Captain Weaver's response to her November 28, 2001 complaint. In that complaint, Goebert had described her urgent medical need, complained about the staff's indifference to it, and pleaded to see an obstetrician. See supra at ___. Weaver responded in writing that she would have to pay for a visit to an obstetrician and should speak to the medical staff about it (the same staff whose indifference she had complained about). Goebert did not receive Weaver's response until December 6, 2001, four days after her baby was stillborn. Id. at ___.

Goebert did not know that she should, or could, appeal Captain Weaver's denial of her complaint. There is some uncertainty about whether she ever received the Inmate Handbook, but even assuming that she did, there is nothing in it about any procedure for appealing the denial of a complaint or any request. The parties agree on that. The parties also agree that the appeal procedure is laid out in the jail's General Operating Procedures, but that no inmate was ever permitted to

17

see those procedures, at least not until Goebert filed this lawsuit and her attorney ferreted out a copy of them through discovery. What the parties disagree about is how the PLRA's availability requirement applies in this circumstance.

The availability requirement of the PLRA stems from 42 U.S.C. § 1997e(a), which provides: "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The Supreme Court has recently said that this "invigorated" exhaustion requirement is the "centerpiece" of the PLRA. Woodford v. Ngo, 548 U.S. ___, ___, 126 S. Ct. 2378, 2382 (2006). It helps to ensure that the "flood of nonmeritorious claims does not submerge and effectively preclude consideration of the allegations with merit." Jones v. Bock, ___ U.S. ___, ___, 127 S. Ct. 910, 914 (2007). In addition to "reduc[ing] the quantity and improv[ing] the quality of prisoner suits," the exhaustion requirement also "attempts to eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." Woodford, 548 U.S. at ___, 126 S. Ct. at 2387 (third alteration in original) (internal quotation marks and footnote omitted).

18

It is difficult to define "such remedies as are available" to an inmate in a way that includes remedies or requirements for remedies that an inmate does not know about, and cannot discover through reasonable effort, by the time they are needed. Nevertheless, some of the defendants try. They argue that any remedy that is in place in a jail is "available" to the inmate even if the inmate does not know, and cannot find out, about it. That argument could have been inspired by the Queen of Hearts' Croquet game, since there is nothing on this side of the rabbit hole to support it.[4] Having kept Goebert in the dark about the path she was required to follow, the defendants should not benefit from her inability to find her way.

The defendants argue that our decision in Alexander v. Hawk, 159 F.3d 1321 (11th Cir. 1998), supports their hide-and-seek position on administrative remedies, but it doesn't. That case involved the relationship between "available" and "remedy," specifically whether the fact that the administrative procedures did not provide the particular remedy the inmate sought means that there was no available remedy to exhaust. Id. at 1326–28. We held, in part, that the use of the

_____

[4] "I don't think they play at all fairly, . . . they don't seem to have any rules in particular: at least, if there are[,] no-body attends to them—and you've no idea how confusing it is . . . ." Lewis Carroll, Alice's Adventures in Wonderland (1865), reprinted in The Complete Works of Lewis Carroll 81–86 (Barnes and Noble Books 2001) (internal quotation marks omitted).

term "available" in § 1997e(a) acknowledged that some jails and prisons did not actually have administrative remedy programs, but it did not mean that no remedy was available unless the specific form of remedy the inmate sought could be had. Id. at 1326.

The Supreme Court later reached the same conclusion. See Booth v. Churner, 532 U.S. 731, 738, 741, 121 S. Ct. 1819, 1823, 1825 (2001) (also interpreting the meaning of "available" to be its dictionary definition, "capable of use for the accomplishment of a purpose." (citing Webster's Third New International Dictionary 150 (1993))). Neither our Alexander decision, nor the Supreme Court's Booth decision held or implied that an unknown remedy is "available" within the meaning of § 1997e(a). See also Brown v. Sikes, 212 F.3d 1205, 1207–08 (11th Cir. 2000) (holding that a prisoner must "provide as much relevant information as he reasonably can in the administrative grievance process, . . . [but] a grievance procedure that requires a prisoner to provide information he does not have and cannot reasonably obtain is not a remedy that is 'available' to the prisoner"); Hemphill v. New York, 380 F.3d 680, 688 (2d Cir. 2004) ("The test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." (internal quotation marks omitted)); Miller

v. Norris, 247 F.3d 736, 740 (8th Cir. 2001) ("[A] remedy that prison officials prevent a prisoner from 'utiliz[ing]' is not an 'available' remedy under § 1997e(a) . . . ." (second alteration in original)); cf. Lewis v. Casey, 518 U.S. 343, 351, 116 S. Ct. 2174, 2180 (1996) (noting that a prisoner would allege a constitutional harm if, for example, "a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known").

The reason there is no precedent to support the defendants' argument is that it makes no sense. That which is unknown and unknowable is unavailable; it is not "capable of use for the accomplishment of a purpose." Booth, 532 U.S. at 738, 121 S. Ct. at 1823. If we allowed jails and prisons to play hide-and-seek with administrative remedies, they could keep all remedies under wraps until after a lawsuit is filed and then uncover them and proclaim that the remedies were available all along. The Queen would be proud.

**B.**

As a fallback argument on the availability issue, the defendants contend that, even if Goebert's unawareness of the appeal procedure before she filed her lawsuit means it was unavailable to her then, she did learn of it afterwards when

21

she obtained a copy of the General Operating Procedures through discovery. That, they say, means that the appeal remedy was available to Goebert at that point, making it proper to dismiss her lawsuit because she made no attempt to administratively appeal Weaver's response to her complaint once she learned that she could have done so (if only she had known).

The record does not indicate exactly how long after Goebert filed her lawsuit that she pried loose a copy of the General Operating Procedures and discovered that the appeal procedure existed. From the filing date of the lawsuit, however, we can tell that the earliest would have been three years or so after Captain Weaver's response to her complaint. The appeal procedure Goebert finally discovered requires that any appeal be filed within five days, a deadline that would have passed more than a thousand days before she learned of it. The Supreme Court has interpreted "exhausted" to mean properly exhausted, and an untimely appeal would not properly exhaust remedies. See Woodford, 548 U.S. at ___, 126 S. Ct. at 2382. It follows that an administrative remedy that was not discovered, and which could not have been discovered through reasonable effort, until it was too late for it to be used is not an "available" remedy.

This common sense reasoning is supported by the language of the statutory provision itself, which states that: "[n]o action shall be brought . . . until such

administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

The time the statute sets for determining whether exhaustion of administrative

remedies has occurred is when the legal action is brought, because it is then that

the exhaustion bar is to be applied. See id. ("No action shall be brought . . . .").

Otherwise, the exhaustion requirement would not serve its purposes of permitting

corrections officials an opportunity to redress grievances before a lawsuit is

initiated, thereby reducing the amount of inmate litigation that is filed. See

Woodford, 548 U.S. at ___, 126 S. Ct. at 2387 (2006) (discussing that the

exhaustion requirement in the PLRA "seeks to affor[d] corrections officials time

and opportunity to address complaints internally before allowing the initiation of a

federal case," and was intended to "reduce the quantity and improve the quality of

prisoner suits." (alteration in original) (internal quotation marks omitted); Porter v.

Nussle, 534 U.S. 516, 524–25, 122 S. Ct. 983, 988 (2002) ("Beyond doubt,

Congress enacted § 1997e(a) to reduce the quantity and improve the quality of

prisoner suits; to this purpose, Congress afforded corrections officials time and

opportunity to address complaints internally before allowing the initiation of a

federal case."). Because  an administrative remedy that is unavailable until after

the lawsuit is filed is not an available remedy within the meaning of § 1997e(a)'s

exhaustion requirement, the appeal remedy was not one that Goebert was required to exhaust.

## C.

The defendants' last exhaustion contention concerns not the appeal Goebert did not file but the complaint she did file on November 28, 2001. They argue that her written complaint was inadequate to exhaust her remedies, or in the Supreme Court's words, there was not "proper exhaustion," meaning "compliance with an agency's deadlines and other critical procedural rules." Woodford, 548 U.S. at ___, 126 S. Ct. at 2386. The defendants complain that Goebert did not use the correct form. She used what the defendants describe as a "request form," not the official "grievance form" that they say she should have used.

It is undisputed that Goebert did not have an official grievance form, if one even existed. No such form is in the record, and more importantly, there is no evidence in the record to indicate that Goebert knew or reasonably could have known that a special grievance form existed and should be used. Even assuming that Goebert was given the Inmate Handbook, the instruction it provides is that inmates wishing to file a formal complaint should submit "a written request (indicating 'grievance') . . . contain[ing] the inmate's name and location and all the facts of the grievance including names and dates."

24

Goebert was provided with and filed a form that allowed her to check the box next to "request" or the one next to "complaint." She marked the box next to "complaint," thereby indicating that she was filing a complaint. "Complaint" and "grievance," as used in this context, are synonymous. See Random House Unabridged Dictionary 840 (2d ed. 1993). It is worth mentioning that even the prized General Operating Procedures, which the jail administrators kept to themselves, specifically contemplated the "[u]se of the Request Form" for registering a grievance.

The complaint Goebert filed contained her name, her cell number, and the date and time she filed it. It set out cogently all of the facts constituting her grievance, a chronology of relevant events including the date the problem began and when it had gotten worse, her efforts to get help, and what she wanted done. The definition of "grievance" in the General Operating Procedures is "[a] circumstance or action considered to be unjust and grounds for complaint or resentment." Goebert's complaint was certainly that. The denial of adequate medical care to a pregnant inmate who is leaking the amniotic fluid necessary for the survival of her fetus could fairly be "considered to be unjust and grounds for complaint or resentment." Goebert's complaint was a grievance.

25

We need not decide, as some of our sister circuits have, how much less than perfect compliance with administrative remedies is enough to constitute exhaustion for purposes of § 1997e(a), or what, if any, exceptions to the exhaustion requirement exist.  See Dole v. Chandler, 438 F.3d 804, 811 (7th Cir. 2006) (holding that a prisoner properly exhausted his administrative remedies when the jail lost his timely grievance form but the prisoner did not attempt to re-file his complaint); Hemphill v. New York, 380 F.3d 680, 689 (2d Cir. 2004) (recognizing "special circumstances" that permit less than perfect compliance, including reasonable but incorrect readings of the administrative procedures, and recognizing estoppel and failure to raise or preserve the defense as exceptions to the exhaustion requirement); Spruill v. Gillis, 372 F.3d 218, 232 (3d Cir. 2004) (holding that substantial compliance with administrative procedures will exhaust them under the PLRA); see also Woodford, 548 U.S. at ___, 126 S. Ct. at 2393 (Breyer, J., concurring) (recognizing that § 1997e(a) requires proper exhaustion, but suggesting that traditional exceptions to administrative exhaustion also apply to it).

It is enough to hold, as we do, that under any recognized standard, and without resort to any exceptions, Goebert's November 28, 2001, complaint was sufficient to exhaust her administrative remedies.  For that reason, we will vacate

26

the district court's judgment insofar as it granted summary judgment against Goebert on exhaustion grounds.

## III.

In addition to its ruling on PLRA grounds, the district court granted summary judgment to Captain Weaver both on the merits of the deliberate indifference claims and on qualified immunity grounds.[5]  We disagree.

Goebert contends that Captain Weaver displayed deliberate indifference to her amniotic leak, resulting in her fetus' death.  Deliberate indifference to a prisoner's serious medical needs is a violation of the Eighth Amendment.  See Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976).  Correctional

---

[5]  Although it granted Dr. Brown summary judgment on exhaustion grounds, the district court went further and addressed whether, if it were wrong about exhaustion, he would be entitled to summary judgment anyway because there was no genuine issue of material fact about the merits of the deliberate indifference claim against him.  The court concluded that he would not be entitled to summary judgment on that alternative ground.

Denials of summary judgment ordinarily are not appealable interlocutorily or after trial. Munoz v. Oceanside Resorts, Inc., 223 F.3d 1340, 1344 n.3 (11th Cir. 2000).  We recognize, however, that we probably have discretion to review the deliberate indifference merits issue as it relates to Dr. Brown because it could provide an alternative basis for affirming the district court's grant of summary judgment to him, even though we would have to disagree with the district court on the issue in order to affirm it on that ground.  See Powers v. United States, 996 F.2d 1121, 1123–24  (11th Cir. 1993) ("We may affirm the district court's judgment on any ground that appears in the record, whether or not that ground was relied upon or even considered by the court below.").  However, we decline to exercise our discretion to review whether the district court erred in concluding that Brown was not entitled to summary judgment on the alternative ground that there was no genuine issue of material fact about the merits.  Likewise, we will not decide whether any of the remaining defendants should have been granted summary judgment on some alternative ground the district court did not reach.

27

officers are, of course, bound by the Eighth Amendment's prohibition against cruel and unusual punishment.  Id.  Technically, the Fourteenth Amendment Due Process Clause, not the Eighth Amendment prohibition on cruel and unusual punishment, governs pretrial detainees like Goebert.  Snow ex rel. Snow v. City of Citronelle, Ala., 420 F.3d 1262, 1268 (11th Cir. 2005).  However, the standards under the Fourteenth Amendment are identical to those under the Eighth.  Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1115 (11th Cir. 2005).

In order to prove deliberate indifference a prisoner must shoulder three burdens.  First, she must satisfy the objective component by showing that she had a serious medical need.  Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005) (per curiam).  Second, she must satisfy the subjective component by showing that the prison official acted with deliberate indifference to her serious medical need. Id.  Third, as with any tort claim, she must show that the injury was caused by the defendant's wrongful conduct.  See Hale v. Tallapoosa County, 50 F.3d 1579, 1582 (11th Cir. 1995).

A medical need that is serious enough to satisfy the objective component "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a

doctor's attention." Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994) (internal quotation marks omitted). An amniotic fluid leak that is severe enough to cause stillbirth is a serious medical need. See Archer v. Dutcher, 733 F.2d 14, 17 (2d Cir. 1984) (reversing a grant of summary judgment against a female prisoner who miscarried allegedly as a result of a five hour delay in responding to her vaginal bleeding). Medical evidence in the record establishes that prolonged amniotic leakage constitutes a serious medical problem that can lead to infection and the death of a fetus. The evidence in the record is sufficient to satisfy the objective component of the deliberate indifference test.

The subjective component of the test for this type of Eighth Amendment violation requires a showing that a prison official acted with deliberate indifference to the prisoner's serious medical need. Bozeman, 422 F.3d at 1272. This means that the "[p]laintiff must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Id. (second alteration in original) (internal quotation marks omitted).

Whether a particular defendant has subjective knowledge of the risk of serious harm is a question of fact "subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude

29

that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer v. Brennan, 511 U.S. 825, 842, 114 S. Ct. 1970, 1981 (1994) (citation omitted). Disregard of the risk is also a question of fact that can be shown by standard methods. Id. at 846, 114 S. Ct. at 1983.

The meaning of "more than gross negligence" is not self-evident but past decisions have developed the concept. In cases that turn on the delay in providing medical care, rather than the type of medical care provided, we have set out some factors to guide our analysis. Where the prisoner has suffered increased physical injury due to the delay, we have consistently considered: (1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay. See Hill, 40 F.3d at 1189.

The final requirement for a deliberate indifference claim is that a defendant have a causal connection to the constitutional harm. Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003). Causation, of course, can be shown by personal participation in the constitutional violation. Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam).

Goebert contends that Captain Weaver showed deliberate indifference to her serious medical need by failing to respond to her complaint that she had been

leaking fluid for more than a week, that the problem had grown worse in the previous four days, and that she needed to see an obstetrician.

Goebert's complaint gave Weaver sufficient information for him to have subjective knowledge of her serious medical need. Her complaint informed him that she had been leaking fluid for nine days, that the jail doctor recognized the need for her to see an outside doctor, that the problem had become worse since she was seen by the jail doctor, and that she had not felt the baby move for a few days before writing the complaint. Weaver was obviously aware of the contents of her complaint because he responded to it.

The information in Goebert's complaint gave Captain Weaver abundant reason to believe that her medical need was serious. The test for seriousness includes whether the need "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hill, 40 F.3d at 1187 (internal quotation marks omitted). Even Weaver later admitted that Goebert's complaint sounded at least "[p]otentially" important and that it "seems self-evident" that the leaking of amniotic fluid could have serious consequences.

The fact that Goebert had been seen by Dr. Brown does not mean that a layman could not tell that she had a serious medical need at the time Captain Weaver received her complaint. For one thing, her complaint stated that Brown

had recommended that she see an obstetrician.  For another, her complaint made it clear that the medical staff who had seen Goebert had not attended to her needs. A lay person would recognize the need for an obstetrician's  attention in the circumstances that Goebert described to Weaver, including Brown's recommendation to that effect, and a factfinder could reasonably conclude from the evidence that Weaver himself did recognize that need.

Captain Weaver had a duty to look into the matter.  As we have said in other contexts, "[a] party that willfully blinds itself to a fact . . . can be charged with constructive knowledge of that fact." United States v. Baxter Int'l, Inc., 345 F.3d 866, 902 (11th Cir. 2003).  Choosing to deliberately disregard, without any investigation or inquiry, everything any inmate says amounts to willful blindness.

Captain Weaver had the authority to send Goebert to the hospital or to request that EMSA address the problem.  Instead, in response to her complaint, he scrawled a note on the bottom of her complaint form saying:  "Medical can set this up at your expense if you desire."  Rather than take any action or even inquire into the situation, Weaver referred Goebert back to the same medical staff that she told him had ignored her daily requests for aid and had already failed to set up an appointment for her with an outside obstetrician after Dr. Brown had determined that she needed to see one.

Captain Weaver's response also misstated jail policy. In his deposition, Weaver conceded that the only time an inmate would have to pay for her own care would be if she demanded medical care that the prison medical staff did not believe that she needed, or if she demanded a particular outside doctor or facility instead of the one chosen by the jail. Dr. Brown had already decided that Goebert needed to see an outside obstetrician, and Weaver knew that because it was in Goebert's complaint to him. Goebert was not requesting a particular doctor or facility. She was simply pleading for the outside medical care that Brown had already determined she needed.

Captain Weaver himself testified that if the medical care "were part of what [the jail's] service provider deemed necessary and proper care . . . they would pay for it." Specifically, the Health Services Agreement between Lee County and EMSA states that: "EMSA will provide total medical prenatal care to any and all pregnant inmates/detainees" including "hospital admission of any inmate/detainee who, in the opinion of the EMSA Medical Director, requires hospitalization." Instead of seeking to carry out that policy, Weaver misstated it in denying Goebert's plea for help, and he failed to even contact the Medical Director.

Viewing the facts in the light most favorable to Goebert, see Shotz, 344 F.3d at 1164, Captain Weaver acted with more than gross negligence. The

33

seriousness of Goebert's medical need is not debatable; she was in imminent danger of losing the fetus and needed the care of an obstetrician. A medical doctor retained by the jail had determined that she needed to see an outside doctor. In his deposition, Weaver conceded that if he had believed what Goebert said in her complaint to him he would have sought help for her—in his words, "[i]t seems self-evident" that an amniotic leak could have serious medical consequences.

The problem is that Captain Weaver did not believe Goebert, and the reason he did not believe her smacks of deliberate indifference. His deposition testimony, read in the light most favorable to Goebert, leads to the conclusion that Weaver automatically disbelieved any medical complaint by an inmate. When asked about his reaction to the statement in Goebert's complaint to him that she had miscarried in earlier pregnancies, Weaver stated that he "would be hesitant to draw that conclusion from that kind of a document from an inmate" because inmates had lied before. Upon further questioning about Goebert's complaint, Weaver stated that although "[i]t could be important. It could be . . . an inmate lying. It could be nothing." He said that he "kind of doubt[ed] that" the "[m]edical staff seem[ed] unconcerned," and inmates had lied about their water breaking before.

The way medical procedures at the jail worked, the only time it would be necessary for an inmate to complain to Captain Weaver about medical care is

34

when the medical staff was not responding to her needs. Weaver's deliberate decision to automatically disbelieve all inmate statements about medical care, regardless of the circumstances, amounts to a decision to withhold medical care no matter what the circumstances actually were. That is not gross negligence, but instead is deliberate indifference to the true facts of an inmate's medical condition and needs.

Captain Weaver's failure to act on Goebert's complaint delayed her treatment from the time he received her complaint to the time that she was taken to the hospital without his intervention. The period of delay was approximately one day, and there was no good reason for it. The question is whether that delay worsened Goebert's condition, a question which overlaps with the causation inquiry. There is evidence in the record establishing that the earlier someone in Goebert's condition receives treatment, the better the chance that the child she is carrying will survive. The evidence would support a finding that the immediate cause of the fetus' death was chorioamnionitis, an infection that can develop in a matter of hours. The longer the mother's membranes are ruptured, the greater the chance that infection will occur. The doctors at the hospital where Goebert was eventually taken stated that one of the principal means of treating her condition in order to save the fetus is sewing the cervix shut, but by the time she got there she

35

was too dilated for that procedure. The evidence supports the conclusion that for Goebert's dire medical need time was of the essence, and the delay attributable to Weaver's deliberate indifference may have caused the loss of her child. Whether it actually did is a jury question.

For all of these reasons, we conclude that Captain Weaver was not entitled to summary judgment on the merits of Goebert's deliberate indifference claim against him. That leads us to the question of whether Weaver was nonetheless entitled to qualified immunity insofar as the claim against him was concerned. The doctrine of qualified immunity protects public officials to some extent from lawsuits against them in their individual capacities. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).

To claim qualified immunity, a defendant official must first show that his allegedly wrongful act or omission occurred while he was engaged in a discretionary duty. Mercado v. City of Orlando, 407 F.3d 1152, 1156 (11th Cir. 2005). There is no dispute that the actions and omissions in question fell within the scope of Captain Weaver's discretionary authority in running the jail.

Once a constitutional violation is found (or it is determined that whether there was one depends on disputed factual issues) and the discretionary action element is established, the question is whether the official's alleged acts or

36

omissions "violate clearly established statutory or constitutional rights." Harlow, 457 U.S. at 818, 102 S. Ct. at 2738. The standard for determining whether a right is well-established for purposes of qualified immunity is whether the right violated is one about "which a reasonable person would have known." Id. The Supreme Court has specifically held that the Harlow standard is the appropriate one for determining qualified immunity in Eighth Amendment cases, see Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515 (2002), and we have applied that standard, see Andujar v. Rodriguez, 486 F.3d 1199, 1203 (11th Cir. 2007).

We recognize three sources of law that would put a government official on notice of statutory or constitutional rights: specific statutory or constitutional provisions; principles of law enunciated in relevant decisions; and factually similar cases already decided by state and federal courts in the relevant jurisdiction. See Hope, 536 U.S. at 741, 122 S. Ct. at 2516 ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." (alteration in original) (internal quotation marks omitted)); Marsh v. Butler County, Ala., 268 F.3d 1014, 1032 n.9 (11th Cir. 2001) (en banc) ("[P]reexisting case law, tied to the

37

precise facts, is not in every situation essential to establish clearly the law applying to the circumstances facing a public official so that a reasonable official would be put on fair and clear notice that specific conduct would be unlawful in the faced, specific circumstances."); see also Vinyard v. Wilson, 311 F.3d 1340, 1351–52 (11th Cir. 2002) (explaining the relationship of the three sources of law in an excessive force case). The more general the statement of law is that puts the official on notice, the more egregious the violation must be before we will find that the official is not entitled to qualified immunity. See Brosseau v. Haugen, 543 U.S. 194, 199, 125 S. Ct. 596, 599 (2004) (per curiam) (finding, in a Fourth Amendment excessive force case, that although "in an obvious case, [general tests] can 'clearly establish' the answer, even without a body of relevant case law," reference to specific cases is necessary where the question is closer); Hope, 536 U.S. at 740–41, 122 S. Ct. at 2516 ("This is not to say . . . that the single warning standard points to a single level of specificity sufficient in every instance. . . . [When considering] a general rule . . . a very high degree of prior factual particularity may be necessary." (internal quotation marks omitted)); Vinyard, 311 F.3d at 1351–52 (requiring more obvious violations of rights the more generally the rights are framed).

Here, there are principles of law enunciated in relevant decisions and factually similar cases previously decided by this Court, which clearly establish that Captain Weaver's conduct amounted to deliberate indifference. The Supreme Court's decision in Estelle established that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." Estelle, 429 U.S. at 104, 97 S. Ct. at 260 (internal citation omitted) (quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S. Ct. 2909, 2925 (1976)). As for unnecessary delays in treatment constituting deliberate indifference, we held in Lancaster v. Monroe County, Ala., 116 F.3d 1419 (11th Cir. 1997), that "an official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay." Id. at 1425. However, "[t]his general statement of law ordinarily does not preclude qualified immunity in cases involving a delay in medical treatment . . . . The cases are highly fact-specific and involve an array of circumstances pertinent to just what kind of notice is imputed to a government official and to the constitutional adequacy of" the official's acts and omissions. Bozeman, 422 F.3d at 1274.

39

Captain Weaver's alleged inaction is of the type that we have held violates the well established right of prisoners to timely treatment for serious medical conditions. See Harris v. Coweta County, 21 F.3d 388, 394 (11th Cir. 1994); McElligott v. Foley, 182 F.3d 1248, 1260 (11th Cir. 1999); Mandel v. Doe, 888 F.2d 783, 788–90 (11th Cir. 1989). One specific case that is sufficiently similar to have put Weaver on notice that his actions or inactions violated Goebert's constitutional right to timely treatment of her serious medical needs is Carswell v. Bay County, 854 F.2d 454 (11th Cir. 1988). There, a pretrial detainee "repeatedly requested medical treatment," but was given ineffective treatment or ignored altogether. Id. at 455. He was then misdiagnosed as suffering from tonsilitis and constipation. Id. The detainee "continued to complain about health problems" and lost a great deal of weight. Id. His attorney asked the jail administrator to see that the detainee got medical attention, but the administrator, despite recognizing that the detainee was "emaciated and needed medical attention, . . . simply yelled into a crowded room [at the jail]: 'Get this man to see a doctor.'" Id. Two days later, the jail doctor diagnosed the detainee as a diabetic. Id. We held that these facts supported a jury verdict for the plaintiff on a claim of deliberate indifference. Id. at 457.

Like the jail administrator in <u>Carswell</u>, Captain Weaver had reason to know that Goebert, a pretrial detainee, had a serious medical problem that needed attention, but he chose to do even less than the defendant official in <u>Carswell</u> did. Weaver chose to disbelieve, without investigation, everything Goebert said simply because she was an inmate, and his reply to her complaint misstated the jail's policy on medical procedures to her. Telling an impoverished inmate that she cannot have the medical care she direly needs to save the life of her child unless she can pay for it is as bad or worse than yelling into a crowded room for someone else to get her to a doctor. A reasonable corrections officer would have known that this conduct was unlawful. Weaver is not entitled to qualified immunity. The district court should not have granted summary judgment in his favor.

## IV.

In addition to ruling that Sheriff Scott was entitled to summary judgment on exhaustion of administrative remedies grounds, the district court ruled in the alternative that he was entitled to summary judgment on the merits of the deliberate indifference claim. That ruling did not involve qualified immunity because Scott was sued only in his official capacity. (As we pointed out while recounting the facts, Scott was not even in office at the time of the events giving

41

rise to this lawsuit, but after taking office he was substituted into the lawsuit for the sheriff who had been.)

The Sheriff had no direct contact with Goebert. The basis for her claim against him is his office's supervisory responsibilities over the jail. We do not recognize vicarious liability, including respondeat superior, in § 1983 actions. Cottone, 326 F.3d 1360. In order to establish that a defendant committed a constitutional violation in his supervisory capacity, a plaintiff must show that the defendant instituted a "custom or policy [that] result[s] in deliberate indifference to constitutional rights or . . . directed [his] subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." West v. Tillman, 496 F.3d 1321, 1328–29 (11th Cir. 2007) (per curiam) (first and second alterations in original) (internal quotation marks omitted) (quoting Cottone, 326 F.3d at 1360).

As we have explained, "[a] policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997). A custom is an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law. City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S. Ct. 915, 926

42

(1988). Demonstrating a policy or custom requires "show[ing] a persistent and wide-spread practice." Depew v. City of St. Mary's, Ga., 787 F.2d 1496, 1499 (11th Cir. 1986).

Goebert's official capacity claim against Sheriff Scott relies on the Lee County Jail's policy of not permitting inmates to lie down during the daytime without a pass coupled with the staff's failure to issue such passes when medically necessary. The policy of not permitting inmates to lie down at their leisure during the daytime is a reasonable one. It certainly is not facially unconstitutional. Goebert's claim, in effect, is that this facially constitutional policy was implemented in an unconstitutional manner—one that ignored medical needs.

Our decisions establish that supervisory liability for deliberate indifference based on the implementation of a facially constitutional policy requires the plaintiff to show that the defendant had actual or constructive notice of a flagrant, persistent pattern of violations. See West, 496 F.3d at 1329 ("'The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.'" (quoting Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999)); Mathews v. Crosby, 480 F.3d 1265, 1271 (11th Cir.), petition for cert. filed, 76 U.S.L.W. 3050 (U.S. Jul. 23, 2007) (No. 07-86) (reviewing the facts in the light

most favorable to the plaintiff to determine "whether [a prison warden] was put on notice by a history of widespread abuse at [the prison], or whether he had established customs or policies resulting in deliberate indifference to a prisoner's constitutional rights"); Marsh, 268 F.3d at 1037 ("Unless a policymaker knows of the need [to remedy an unconstitutional condition], no liability can arise from failure [to do so].").  As the Supreme Court has stated, "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  Bd. of County Comm'rs v. Brown, 520 U.S. 397, 410, 117 S. Ct. 1382, 1391 (1997).

Goebert has not shown that the Sheriff had actual knowledge that the lie-in pass policy was being implemented in a way that ignored medical needs.  There is no evidence that he knew that, if it was a fact.  Nor has Goebert shown that the misapplication of the policy was so widespread that we can attribute constructive knowledge to the Sheriff.  In fact, she has not shown that any other inmate had ever been denied a lie-in pass when needed for medical reasons.  As a result, she has "failed to meet the 'extremely rigorous' standard for supervisory liability." West, 496 F.3d at 1329 (quoting Cottone, 326 F.3d at 1360).  The district court correctly granted summary judgment to Sheriff Scott.

## V.

44

We reverse the judgment of the district court insofar as it concerns Defendants Brown, Weaver, EMSA, and PHS. We affirm the judgment insofar as it involves Defendant Scott. We remand the case to the district court for proceedings consistent with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED.