[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-13791
Non-Argument Calendar
_____

D.C. Docket No. 3:12-cv-00999-TJC-MCR

FRANKLIN R. HARRIS,

Plaintiff - Appellant,

versus

PRISON HEALTH SERVICES,
a Florida Corporation, et al.,

Defendants,

WILLIAM NEILDS,
Doctor,
RICKY ALLEN,
Sergeant,
JAMES BUNTING,
Nurse,

Defendants - Appellees.
_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(August 23, 2017)

Before TJOFLAT, HULL and WILLIAM PRYOR, Circuit Judges.

HULL, Circuit Judge:

Plaintiff Franklin Harris is a prison inmate at the Hamilton Correctional Institution in Jasper, Florida. This case arises out of Harris's fall from a transport van and subsequent medical treatment. Harris brought deliberate indifference claims under the Eighth Amendment. On appeal, Harris argues that the district court erred by granting summary judgment in favor of two defendant medical professionals who treated him on the day of his fall. After thorough review, we affirm.

## I.  BACKGROUND

### A.    Harris's Fall on April 9, 2010

According to Harris's verified third amended complaint, on April 9, 2010, two correctional officers transported Harris from the prison to a medical appointment with an eye specialist. Harris is a 67 year old man with degenerative back problems who uses a wheelchair to help with his mobility. Harris, in a wheelchair, traveled in a handicap accessible van. Harris was shackled with a waist chain, handcuffs, and restraints on both ankles.

On the way to the eye doctor, the officers stopped at the Lake Butler Regional Medical Center ("the hospital"), a separate facility run by the Florida

2

Department of Corrections.  Defendant Sergeant Ricky Allen directed Harris to move from the handicap accessible van into a regular fifteen passenger van.  To move into the regular van, Harris had to leave his wheelchair, which he was able to do.  The regular van did not have any steps to help passengers get in and out, but Sergeant Allen placed an aluminum handcuff storage box outside the van for Harris to step onto and move into the van.  At first, Sergeant Allen helped Harris into the van by holding Harris's left arm.  According to Harris, Sergeant Allen let go before Harris had finished stepping onto the box.  Harris alleges that when Sergeant Allen let go of him, this caused Harris to fall head first onto the pavement.

Harris's head struck and bounced off of the pavement, making contact above Harris's right eye.  Harris's right hand also struck the pavement in his attempt to stop his fall.  At that time Harris was dizzy but was not bleeding at all.

**B.    April 9, 2010 Emergency Room Visit with Dr. Nields**

The correctional officers took Harris to the emergency room at the prison system hospital, where a nurse first examined Harris.  In the medical records, the nurse recorded that Harris had a small hematoma over his right eyebrow and complained of pain in his head and right wrist.  After examining him, the nurse referred Harris to defendant Dr. William Nields, the emergency room doctor.

Dr. Nields examined Harris.  Harris avers that he complained of pain in his head, neck, and hands, impaired vision, and numbness in his right arm.  The medical records do not note any complaints about Harris's neck or impaired vision.

Although he remembers Harris's visit, Dr. Nields does "not recall every detail."  During that visit, Harris was alert, oriented as to person, place, time, and situation, and properly responded to verbal questions.  Dr. Nields saw no evidence that Harris had experienced any loss of consciousness or other evidence of a serious injury.  Harris did have visible swelling on his forehead above his right eye.  As the emergency room doctor, Dr. Nields determined that Harris did not have an emergency medical condition.  Dr. Nields gave Harris Tylenol for his pain and told Harris to consult sick call if his problems persisted.

Dr. Nields did not order an x-ray or other scan of Harris's head because Dr. Nields did not believe an x-ray or MRI was medically necessary based on Harris's condition.  While Harris claims that Dr. Nields's failure to order tests and diagnose his problems delayed his treatment, Harris admits that this was "a misjudgment medical thing."

C.    **Return to Prison to see Nurse Bunting on April 9, 2010**

After the emergency room visit at the prison system hospital, the correctional officers took Harris to his eye exam that day.  On the return trip to the prison, Harris showed one correctional officer the swelling over his right eye and

4

complained of severe pain.  The correctional officer told Harris to declare a medical emergency as soon as he returned to the prison.

Upon arrival at the prison, Harris was taken to the medical department.  The correctional officer on duty in the medical department looked at Harris's injuries and then called defendant Nurse James Bunting and explained the nature of Harris's visible injury.  In the medical records, Nurse Bunting wrote that Harris had been seen by Dr. Nields, a prison doctor, earlier that day at the emergency room.  According to Harris, Nurse Bunting (1) heard about Harris's injuries from the correctional officer, but, "without conducting a medical evaluation of any kind," told Harris: "Go to your dormitory"; (2) threatened Harris with confinement if he continued to complain; and (3) walked away when Harris tried to show Nurse Bunting the swelling on his head and arm.  After Nurse Bunting walked away, the correctional officer on duty told Harris to declare a medical emergency, which Harris did.

Later that day, the correctional officers changed shifts, and the new officer on duty asked Harris why he was still in the medical department.  Harris responded that he had declared a medical emergency and showed the new officer his injuries.  After Harris explained his injuries, the new officer went and got Nurse Bunting to return.  According to Harris, Nurse Bunting approached him and said: "What part of no do you not understand? . . . .Go back to your dormitory."  At that point, the

5

correctional officer spoke to Nurse Bunting outside of Harris's earshot.  When they returned, Nurse Bunting told Harris: "I'm going to take your vital signs and that's it, then take your behind to the dorm and sign up for sick call."

Nurse Bunting filled out a "nursing assessment" for Harris's April 9, 2010 visit to the prison's medical department.[1]  The nursing assessment noted that a Dr. Nields (at the hospital) had already seen Harris for this occurrence earlier the same day.  Nurse Bunting took and recorded Harris's vital signs, including his temperature, blood pressure, and weight.  The nursing assessment stated that Harris's pupils were "PERLA," meaning "pupils equal round react to light, accommodation."  Nurse Bunting noted a "small 20mm hematoma" on Harris's right eyebrow and reported a "normal neurological status" for which no treatment was required.  According to Nurse Bunting, the medical records demonstrate that he "performed an independent medical evaluation" of Harris and determined that Harris did not require emergency measures, had no medical emergency, and needed no further treatment or diagnostic testing.  Nurse Bunting also directed Harris to "utilize sick call for non-emergency issues."

---

[1]In support of the motion for summary judgment, Nurse Bunting submitted his own declaration and admitted that he had no personal recollection of Harris or the details of his examination.  Instead, Nurse Bunting was only able to repeat what was contained in his one-page written nursing assessment.

Harris avers that when he left the prison's medical department, he was still in pain and dizzy.  Harris stated that he did not even receive an ice pack to help the swelling go down.

## D.    April 12, 2010 "Sick Call" Visit

On April 12, 2010 (three days after Harris's April 9 fall), Harris utilized the sick call procedure at the prison.  Harris alleges that his condition had worsened since April 9, as the "pain increase[d]" and was "getting worse," "the swelling [was] getting worse in [his] hand," and the pain in his neck was "getting more severe" compared to when he first got the injury.  Nurse C. Johnson evaluated Harris at the prison's same medical department.

On April 12, Nurse Johnson observed swelling in Harris's hands, arm, and right forehead with a knot on Harris's forehead.  Nurse Johnson referred Harris to a doctor.  That same day, Physician's Assistant Larry Henderson examined Harris and scheduled Harris for x-rays, which Harris had the next day.

## E.    April 13, 2010 X-Rays

On April 13, 2010, Harris had a series of x-rays at the prison.  The x-rays of Harris's skull, right forearm, and right hand were normal and showed no fractures or other abnormalities.  The x-ray of Harris's spine showed joint space narrowing and hypertrophic spurring at C6-7, two discs in the upper spine.

7

Dr. Nields reviewed these x-rays (prior to submitting his declaration in this case) and found that these April 13 x-rays of Harris's head and wrist confirmed his earlier conclusion that x-rays or an MRI were not medically necessary at the time of Harris's April 9 visit to the hospital's emergency room.

Harris claims that the four-day delay from his seeing Dr. Nields in the emergency room to getting an x-ray on April 13 caused him "suffering" and worry and made him "afraid to go to sleep" because he thought he had a concussion and "may die in [his] sleep."

## F.    Ongoing Medical Treatment

About two weeks later, on April 28, 2010, Harris returned to the prison's medical department, complaining of pain in his head, jaw, right eye, and neck with a sharp pain running down his right arm, back, and right leg.  Harris reports that he still had a "knot" the size of a jawbreaker and swelling above his right eyebrow, and the area was tender to the touch.  The medical records stated that Harris complained of swelling and pain, having a knot above his eye that had increased in size, pain in his eye, and double-vision.  A nurse evaluated Harris and referred him to see Physician's Assistant Henderson, who examined Harris that day.

After the examination, Physician's Assistant Henderson scheduled Harris for an MRI, and Harris had an MRI of his cervical spine on May 19, 2010.  The MRI revealed bulging at discs C6-7 in Harris's spine, narrowing between vertebrae, and

8

bone spurring that caused pain traveling down his right arm.  The MRI demonstrated that Harris had degenerative disc disease with associated disc bulging.  After seeing a spinal specialist, Harris had a second MRI that revealed extensive nerve damage to his neck, arm, and hand, as well as bone spurring and three bulging discs.

According to Dr. Nields, Harris's May 2010 MRI of his cervical spine revealed "the full extent of [Harris's] chronic degenerative cervical spine condition."  The x-rays and MRI showed disc bulging, discogenic degenerative disc disease (disk narrowing), and bone spurring of Harris's cervical spine at C6-7. In Dr. Nields's medical opinion, these are chronic conditions that take years to develop and preexisted Harris's April 9 fall getting into the transport van. According to Dr. Nields, these conditions were not emergencies when Dr. Nields saw Harris in the emergency room at the hospital and were properly handled through the prison's sick call procedures and referrals to a specialist.

## G.    Procedural History

In his verified third amended complaint filed pro se, Harris brought claims against Dr. Nields and Nurse Bunting under 42 U.S.C. § 1983 and the Eighth Amendment for deliberate indifference to his medical needs.[2]  Harris alleged that Dr. Nields failed to order x-rays or an MRI and failed to make a proper diagnosis,

---

[2]While Harris proceeded pro se before the district court, on appeal, this Court granted Harris's motion for appointment of counsel.

instead opting for "an easier and less efficacious course of treatment that was cursory and grossly inadequate."

Harris alleged that Nurse Bunting was deliberately indifferent on April 9 by (1) refusing to refer Harris to a doctor, (2) failing to acknowledge Harris's initial complaints of severe pain, dizziness, and swelling, and (3) failing to take steps to ensure that Harris received treatment and diagnostic evaluation.  Harris also claims that Nurse Bunting showed her deliberate indifference by "threatening [Harris] with confinement if [Harris] failed to return to the dormitory and continued to complain."

The district court denied Dr. Nields and Nurse Bunting's motion to dismiss.

After discovery, Dr. Nields and Nurse Bunting filed a motion for summary judgment, which the district court granted.  The district court found that the medical records showed that Harris did not have a serious medical need and only had "minor swelling and bruising."  The district court reasoned that Harris only had conclusory, lay opinions to support his claim.  The district court found that Harris's claims were merely a dispute about medical determinations on April 9 and were at most malpractice, which did not create a constitutional violation.  Finally, the district court found that Harris did not suffer any physical pain and instead alleged only psychological pain from the four days of waiting for x-rays to be sure that he had not suffered any worse injuries.

10

Harris timely appealed.[3]

## II. DISCUSSION

### A.    Standard of Review

We review <u>de novo</u> a district court's grant of summary judgment.  <u>Owen v. I.C. Sys., Inc.</u>, 629 F.3d 1263, 1270 (11th Cir. 2011).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  "At this stage in the proceedings we are required to view all of the evidence in a light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."  <u>Liese v. Indian River Cty. Hosp. Dist.</u>, 701 F.3d 334, 342 (11th Cir. 2012) (internal quotation marks omitted).

---

[3]Harris also brought a claim against Sergeant Allen for negligent failure to protect Harris by denying him the use of his wheelchair and not adequately assisting him with getting into the passenger van.  Harris also claims that he was entitled to monetary damages under the American Disabilities Act and the Rehabilitation Act, although it was unclear against which defendants he asserted that claim.  The district court granted Sergeant Allen's motion to dismiss in full.

On appeal, Harris concedes that his notice of appeal designated only the district court's summary judgment order involving Dr. Nields and Nurse Bunting.  Harris thus did not appeal the district court's dismissal of his claims against Sergeant Allen.  Furthermore, Harris's counseled brief addresses only the claims against Dr. Nields and Nurse Bunting.

11

**B.**    **Eighth Amendment Violations**

Although the United States Constitution does not require comfortable prisons, neither does it permit inhumane ones.  Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994).  The Eighth Amendment governs a prisoner's treatment in prison and the conditions of the prisoner's confinement.  Helling v. McKinney, 509 U.S. 25, 31, 113 S. Ct. 2475, 2480 (1993).  "A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness."  McElligott v. Foley, 182 F.3d 1248, 1257 (11th Cir. 1999).

The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment."  Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976) (citation omitted).  "The inadvertent or negligent failure to provide adequate medical care 'cannot be said to constitute an unnecessary and wanton infliction of pain.'"  Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) (internal quotation marks omitted) (quoting Estelle, 429 U.S. at 105–06, 97 S. Ct. at 292).

12

"To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry." Id. "First, a plaintiff must set forth evidence of an objectively serious medical need." Id. Second, a plaintiff must prove the prison official acted with deliberate indifference to that serious medical need. Id. Third, beyond the objective and subjective inquiries, the plaintiff must show, as with any tort claim, "causation between that indifference and the plaintiff's injury." Gilmore v. Hodges, 738 F.3d 266, 274 (11th Cir. 2013) (internal quotation marks omitted); see also Goebert v. Lee Cty., 510 F.3d 1312, 1326 (11th Cir. 2007).

## C.    Serious Medical Need

"A medical need that is serious enough to satisfy the objective component 'is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Goebert, 510 F.3d at 1326 (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir.1994)). "In either case, 'the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm.'" Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004) (alteration in original) (quoting Farrow, 320 F.3d at 1243).

This Circuit has "recognized a variety of medical needs as serious medical needs," including finding that "broken bones and bleeding cuts are serious medical

13

needs that require attention within hours." Melton v. Abston, 841 F.3d 1207, 1222 (11th Cir. 2016) (per curiam). "Severe pain that is not promptly or adequately treated can also constitute a serious medical need depending on the circumstances." Id.; see also Brown v. Hughes, 894 F.2d 1533, 1538 n.4 (11th Cir. 1990) (per curiam) (collecting cases and noting that a "recent traumatic injury," such as a beating, automobile accident, soft-tissue shoulder injury, or a one and a half inch bleeding cut, is generally sufficient to demonstrate a serious medical need).

Taking the facts in the light most favorable to the non-movant, Harris avers that: (1) he fell getting into the transport van; (2) he suffered from dizziness, pain in his head, neck, and hands, numbness in his right arm, impaired vision, and swelling; and (3) his knot and swelling on his head lasted at least twenty days. Correctional officers took Harris to the emergency room at a prison system hospital, and the emergency room nurse examined Harris and determined that he needed to be seen by Dr. Nields, the emergency room doctor at the prison hospital. Later that day, a third correctional officer back at the prison summoned Nurse Bunting, who ultimately examined Harris. Three days after Harris's fall, another prison nurse decided that Harris, who still had swelling, a knot, and pain, needed a referral to a doctor, and the physician's assistant ordered x-rays.

14

Given these alleged facts by Harris, we cannot say as a matter of law that, on the day of his fall, Harris did not have a potentially serious medical need.  Harris had a visible hematoma on his forehead and experienced pain and swelling that he avers worsened in the coming days.  Harris also fell on his right wrist, which he avers had a contusion and was tender.  While there are disputes of material fact as to the extent of Harris's injuries, the evidence in the light most favorable to Harris creates jury issues as to whether Harris had a serious medical need.  Thus, the district court's grant summary judgment on this basis—lack of a serious medical need—was error.  See Melton, 841 F.3d at 1222-23; see also Aldridge v. Montgomery, 753 F.2d 970, 971, 973-74 (11th Cir. 1985) (per curiam) (finding a jury issue over serious medical need when inmate suffered from headaches and dizziness months after receiving a one and a half inch cut above his right eye).

## D.    Deliberate Indifference

To satisfy the subjective component of the deliberate indifference test, a plaintiff must show that a prison official acted with deliberate indifference to the prisoner's serious medical need.  Goebert, 510 F.3d at 1326.  In particular the plaintiff must prove: (1) subjective knowledge of a risk of serious harm, (2) disregard of that risk, (3) by conduct that is more than gross negligence.  Townsend v. Jefferson Cty., 601 F.3d 1152, 1158 (11th Cir. 2010).

15

Harris contends that an inmate-plaintiff in a deliberate indifference case must show only conduct that is more than mere negligence. But in Townsend in 2010, this Court said: "Although we have occasionally stated, in dicta, that a claim of deliberate indifference requires proof of 'more than mere negligence,' our earlier holding in Cottrell[v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996)], made clear that, after Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970 (1994), a claim of deliberate indifference requires proof of more than gross negligence." Id. (quoting McElligott, 182 F.3d at 1255). In the more recent Melton case in 2016, this Court disagreed with Townsend and said in a footnote (1) that the "'more than mere negligence' standard in McElligott is more consistent with Farmer than the 'more than gross negligence' standard in Townsend"; (2) "the phrase 'more than gross negligence' is not found in either Cottrell or Farmer"; and (3) "Cottrell found no deliberate indifference where the plaintiff failed to prove the 'subjective intent element prescribed in Farmer' and, therefore, did not reach whether Farmer requires 'more than mere negligence' or 'more than gross negligence.'" Melton, 841 F.3d at 1223 n.2. The Melton Court added: "Because McElligott is the earliest Eleventh Circuit case after Farmer to directly address the degree of culpability required under Farmer, we must follow it." Id. Here, we need not decide which standard applies because Harris's claim fails under either standard.

16

## E.    Dr. Nields

The district court properly granted summary judgment in favor of Dr. Nields.  Dr. Nields only saw Harris once in the emergency room shortly after Harris's fall on April 9.  Dr. Nields examined Harris and heard Harris's complaints.  Following this examination, Dr. Nields determined that Harris did not need x-rays or further emergency medical treatment and that he could obtain the necessary medical care through the prison's sick call procedure.  Dr. Nields also treated Harris by giving him Tylenol for his pain.

Harris contends that Dr. Nields acted with deliberate indifference by failing to order x-rays or an MRI and by failing to diagnose his injuries from the fall.[4]

Harris's claim against Dr. Nields is no more than, as Harris put it in his deposition, "a misjudgment medical thing," which does not show deliberate indifference.  See Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) ("Nor does a simple difference in medical opinion . . . support a claim of cruel and unusual punishment.").  Whether prison system medical staff should have employed "additional diagnostic techniques or forms of treatment' is a "classic example of a matter for medical judgment," and, therefore, "[a] medical decision

---

[4]To the extent Harris's third amended complaint may be read to claim that Dr. Nields failed to diagnose his degenerative disc disease, we reject that claim.  Even if Harris's claim was construed so as to include the disc disease, the role of Dr. Nields as an emergency room doctor at the hospital was not to perform a full workup and evaluation of all of Harris's maladies but to determine, and if necessary provide, what emergency medical care Harris might need because of his fall.  Dr. Nields did exactly that.

17

not to order an X-ray, or like measures, does not represent cruel and unusual punishment." Estelle, 429 U.S. at 107, 97 S. Ct. at 293.

Dr. Nields provided Harris with some treatment—an examination in the emergency room and giving him Tylenol—while Harris wanted other treatment, such as x-rays, immediately. This alone does not establish deliberate indifference. See Hamm v. DeKalb Cty., 774 F.2d 1567, 1575 (11th Cir. 1985) (explaining that an inmate desiring "different modes of treatment" does "not amount to deliberate indifference" where the inmate received medical care). Furthermore, the four-day-later x-rays of Harris's skull, right hand, and right forearm all were normal and only confirmed Dr. Nields's earlier medical judgment that no x-rays were required. In any event, there is no evidence of deliberate indifference by Dr. Nields.

**F.    Nurse Bunting**

Like Dr. Nields, Nurse Bunting saw Harris only on April 9, the day of his fall and only after Harris had just been seen by Dr. Nields in the prison system hospital emergency room. Nonetheless, Harris claims that Nurse Bunting acted with deliberate indifference by (1) not referring Harris to see a second doctor on April 9; (2) not accepting Harris's initial set of complaints; (3) threatening Harris with confinement if he continued to seek emergency medical treatment right that day, rather than scheduling a sick call; (4) not providing any further medical care

on April 9 other than seeing him and taking his vital signs; and (5) not taking any steps to ensure Harris received a diagnostic evaluation, including x-rays.

After Dr. Nields saw Harris in the emergency room at the prison hospital, Nurse Bunting did initially refuse to examine or treat Harris on an "emergency" basis when he came back to the prison and told him to sign up for "sick call." Nurse Bunting told Harris "[g]o to your dormitory" and threatened Harris with solitary confinement if Harris complained again.  Harris apparently remained in the medical department at the prison.  Later that same day, another correctional officer summoned Nurse Bunting, but Nurse Bunting initially again directed Harris to go to his cell, stating: "What part of no do you not understand? . . . Go back to your dormitory."

After the correctional officer spoke privately with Nurse Bunting, Nurse Bunting then agreed to see Harris and took his vitals on April 9.  Nurse Bunting's written nursing assessment reported that Harris complained of only a headache and had a small 20mm hematoma on his right eyebrow.  Nurse Bunting wrote that Harris had a "normal neurological status" for which no treatment was needed.

Although a jury question exists as to the extent of Harris's injuries or lack thereof, we still must examine whether Nurse Bunting's conduct was deliberately indifferent and, if so, whether Nurse Bunting's deliberate indifference caused Harris to suffer injury.  Given it is undisputed that Harris was examined by a nurse

19

and then an emergency room doctor at the prison hospital, it is not unreasonable that Nurse Bunting told Harris he should now use the sick call procedure rather than another emergency medical visit back at the prison medical department. Furthermore, Nurse Bunting did later take Harris's vital signs and noted his "normal neurological status."

In any event, the third part of the deliberate indifference analysis asks whether there was causation between Nurse Bunting's alleged indifference and Harris's injury.  See Gilmore, 738 F.3d at 273-74.  At most, Nurse Bunting's alleged failure to treat Harris or order x-rays on April 9 resulted in a delay of three days until he was seen again by the prison's medical staff and four days until he had x-rays that revealed his skull, right wrist, and right forearm were all normal. The hematoma and head pain here were caused by Harris's fall, not by Nurse Bunting.  There is no evidence that having x-rays on April 9, as opposed to April 13, would have healed or helped Harris's hematoma or his sore right wrist.

Dr. Nields had already given Harris pain medication.  The x-rays four-days later revealed that Harris's skull, right hand, and right forearm were normal.  Those diagnostic tests thus would not have had helped with the contusion on Harris's head or the tenderness on his wrist for which Dr. Nields had already prescribed pain medication.  Simply put, Harris has not shown how Nurse Bunting's care caused the pain Harris suffered. There is thus no dispute of material fact on the

20

causation question, and the district court ultimately did not commit reversible error in granting summary judgment in favor of Nurse Bunting.

### III.  CONCLUSION

Accordingly, we affirm the district court's grant of summary judgment to Dr. Nields and Nurse Bunting.

**AFFIRMED.**