[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-11962

_____

D.C. Docket No. 1:16-cv-03691-AT


CHARLES WADE,

Plaintiff-Appellee,

versus

UNITED STATES OF AMERICA, et al.,

Defendants,

GORDON LEWIS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(September 17, 2021)

Before BRANCH, GRANT, and TJOFLAT, Circuit Judges.

BRANCH, Circuit Judge:

While he was incarcerated in a federal prison, Charles Wade punched another inmate and seriously injured him. Either because of the punch, or while opening cans of vegetables moments later, Wade cut his hand, which caused bleeding. After the victim identified Wade as the assailant, a prison officer, Captain Gordon Lewis, escorted Wade for to a holding cell for further investigation. During that approximately ten-minute escort, Wade's hand continued to bleed, and he asked Lewis whether he would be taken to the medical unit. Although Captain Lewis declined to answer, he left Wade in the custody of other officers in a cell that was located three feet from the prison's medical examination room. Captain Lewis then departed the scene. Unfortunately for Wade, it was not until several hours later that a prison nurse provided initial medical care for his wound. Eventually, Wade was transferred to a hospital where he received treatment for a broken bone and partially-severed tendon.

Wade sued several prison officials, including Lewis, alleging that the delay in treatment amounted to deliberate indifference to a serious medical need. Captain Lewis asserted a qualified immunity defense, which the district court denied. Relevant here, on summary judgment, the district court denied qualified immunity to Captain Lewis because, in its view, our decision in *Aldridge v. Montgomery*, 753 F.2d 970 (11th Cir. 1985) (per curiam), clearly established that Captain Lewis's failure to ensure that Wade received prompt medical treatment

violated Wade's constitutional rights.  Captain Lewis appeals, arguing that his case is materially distinguishable from *Aldridge*.  Thus, he contends that the law was not clearly established, and the district court erred in denying him qualified immunity.

After careful consideration and with the benefit of oral argument, we agree with Captain Lewis and conclude that *Aldridge* did not place an objectively reasonable officer in Captain Lewis's position on notice that his conduct was unconstitutional.  Accordingly, because Captain Lewis was entitled to qualified immunity, we reverse the district court's decision.

## I.    BACKGROUND

### A.    Factual Background

Wade was a federal inmate at the United States Penitentiary in Atlanta, Georgia ("USP-Atlanta").  On October 15, 2014, Wade was assigned to work in food service and was preparing for the lunchtime meal.  At approximately 1:35 p.m., Wade got into an altercation with another inmate and punched that inmate in the face.  Wade's punch knocked the other inmate unconscious, the inmate fell to the floor, and Wade walked away to open cans of vegetables.  Wade claims to have cut his hand while opening one of the cans.[1]  He went to the restroom to wash his

---

[1] Wade gave inconsistent explanations for how he cut his hand.  In addition to claiming that he cut it on a can of vegetables, Wade later told a nurse that he cut his hand "on a box."

3

hands and believed that he had stopped the bleeding. However, the wound continued to cause him pain.

Six minutes later, at approximately 1:41 p.m., Bureau of Prisons ("BOP") staff observed Wade's victim lying on the floor behind the food service area. A BOP officer triggered a radio body alarm, notifying all USP-Atlanta personnel of an emergency in the food service hall. A second BOP officer arrived and characterized the scene as "dangerous" because there were approximately 250 inmates in a "small space." This second officer also observed that the injured inmate's lip was bleeding profusely and "dripping blood all over the ground." The injured inmate indicated that he was assaulted by Wade.

An officer then approached Wade and saw that his right hand was wounded in a manner consistent with an injury from a recent fight and was bleeding. Gordon Lewis, then serving as Acting Captain, also reported to the food service area in response to the alarm. Captain Lewis handcuffed Wade and escorted him to the Special Housing Unit ("SHU").[2] As he was being escorted to the SHU,

---

How Wade cut his hand is not ultimately relevant, as it is undisputed that Wade cut his hand, and the cut caused him to bleed.

[2] Inmates suspected of fighting are typically separated from the rest of the inmate population for their safety and for the safety of others. *See* BOP Program Statement 5270.10, https://www.bop.gov/policy/progstat/5270_010.pdf (July 29, 2011). Therefore, Wade was placed in the SHU pending the outcome of an investigation into whether he fought with the other inmate.

Wade asked Captain Lewis, "you're not going to take me to medical?" and Captain Lewis responded, "don't ask me how to be a captain and [I] won't tell [you] how to be an inmate." Wade then told Captain Lewis, "okay . . . you know, I'm bleeding all over this, you know, the place." According to Wade, as he was being escorted to the SHU, he was "leaking blood all over," and there was "a path of blood following us."

The SHU and the main medical unit are in the same building. Medical staff determine how and when to treat inmates and, unless it is a medical emergency, there is no typical amount of time for medical staff to respond to an inmate's injury. Regardless of how an inmate receives an injury, "medical staff needs to be notified."

Wade was taken to the SHU where he could be medically assessed. When Wade arrived there at approximately 1:50 p.m., he was placed in a holding cell that had a wire mesh door. According to Wade, that was "the last time [he] saw [Captain Lewis]." Wade's holding cell was "no more than three feet from the medical exam room where medical staff rendered medical care to SHU inmates."

Once Wade was in the holding cell, a different SHU officer removed Wade's handcuffs.[3] Soon after he was placed in the holding cell, Wade asked SHU

---

[3] Wade claimed that he saw Captain Lewis "intimidating" other SHU officers by "giving orders" before leaving the SHU in order to prevent Wade from receiving medical attention, but he admitted that he did not hear any words uttered by Captain Lewis.

officers if he was going to go to the medical unit, but the officers told him he needed to wait. Sometime between 2:01 and 2:04 p.m., three photographs were taken of Wade's right hand, two of which showed some blood, but that it was "tapering off."

Wade was "bleeding all that time" from when he was placed in the SHU until he got the attention of a USP-Atlanta medical employee, Nurse Ashley Inniss, several hours later.[4] According to Nurse Inniss's clinical notes, she took Wade to the medical exam room where she noted a 3.4 cm (or 1.34 inch) laceration on his right hand near the thumb, cleaned the wound with soap, water, and wound cleaner, applied a topical antibiotic, and covered it with steri-strips and gauze. The clinical notes also indicate that Nurse Inniss prescribed Motrin, instructed Wade about signs of infection, and told him to notify medical staff if any of those signs materialized. Thus, Nurse Inniss's clinical encounter notes document that an "MD [was] notified" and "Staff [were] notified to follow up with inmate."

The next morning, Wade noticed swelling in his hand and put in sick call requests to medical staff, but he did not receive treatment until a day later when he got the attention of an officer walking by. Nurse Stanley Coleman then examined

---

[4] In his deposition, Wade testified that he saw Nurse Inniss "like, two, three hours later." But Nurse Inniss testified that she completed a Clinical Encounter form immediately after examining Wade, and that form indicated that she examined him at 9:35 p.m. on October 15, 2014.

Wade at 3:24 p.m. on October 17, 2014.  Nurse Coleman changed the dressing on the "deep laceration," noted swelling and a decreased range of motion in Wade's right hand, and documented that Wade reported his pain as a ten on the pain scale. Nurse Coleman then immediately ordered that Wade be transported to Atlanta Medical Center ("AMC").

At 6:40 p.m., Wade was transported to AMC's emergency room.  There, Wade received an x-ray at 12:41 a.m., which revealed that he "had a broken bone in his hand" and that the fracture was "intra-articular," *i.e.*, "inside the metacarpal phalangeal joint between the hand and the finger, the little finger."  The 3.4-cm laceration went all the way down to the broken bone, partially cutting the tendon. This wound was consistent with a "fight bite," which occurs when a wound becomes infected based on "difficult-to-control bacteria in the mouth."  At 8:53 a.m. the next morning, Dr. Howard McMahan performed an irrigation and debridement of the wound, which involved washing the wound with saline solution, cutting the skin with a scalpel, removing any "devitalized tissue and any pus," scraping out any foreign material from the subcutaneous tissue, irrigating the wound thoroughly, assessing the tendon to make sure it is functional, looking at the bone to make sure it does not need "any kind of fixation," placing a drain, and then closing the wound.

According to Dr. McMahan, the open wound nature of the "fight bite" injury combined with the delay of getting treatment increased the risk of infection to Wade's hand. He added that the infection would have been less likely to occur if Wade avoided the fight, avoided hitting the other inmate in the mouth, or had the wound cleaned shortly after his injury with antibiotics. After his surgery, Wade was returned to USP-Atlanta where he received medication for pain.

## B.    Procedural History

Wade, proceeding *pro se*, filed a complaint against Captain Lewis under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).[5] Wade alleged that Captain Lewis was deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment. The district court appointed counsel on Wade's behalf.

After discovery, Captain Lewis moved for summary judgment. First, Captain Lewis argued that he was not deliberately indifferent to Wade's serious medical needs because there was no evidence that he was aware of Wade's serious medical needs and disregarded the risk of serious harm to Wade. He further argued that he was not the cause of any delay or denial of treatment to Wade.

---

[5] Wade also sued the United States, two health care professionals at USP-Atlanta, and the warden. His complaint also brought claims against all defendants under the Federal Tort Claims Act ("FTCA"). The district court dismissed those defendants and Wade's FTCA claims as barred by the Inmate Accident Compensation Act. The dismissal of those claims and defendants is not at issue in this appeal.

Second, Captain Lewis argued that he was entitled to qualified immunity.  He

contended that he did not violate Wade's Eighth Amendment rights by taking

Wade to the SHU instead of the medical unit.  He also maintained that there was

no clearly established law that would put him on notice "that placing an inmate in

the SHU after a fight with another inmate rather than taking the inmate to the

Medical Unit was a constitutional violation."

A magistrate judge issued a report and recommendation ("R&R"),

recommending the denial of Captain Lewis's summary judgment motion.  First, the

magistrate judge determined that that there was a genuine dispute of material fact

concerning the alleged constitutional violation: whether Captain Lewis was

deliberately indifferent to Wade's serious medical needs.  Because Wade shed an

indeterminate amount of blood and suffered a broken bone and partially severed

tendon, the magistrate judge reasoned that a jury could find that Wade's injury was

so obvious that a lay person would recognize the need for medical attention.  The

magistrate judge also determined that there was a dispute of material fact

concerning Captain Lewis's knowledge of the seriousness of the medical need

because Captain Lewis may have seen the blood, and Wade brought his bleeding

injury to Captain Lewis's attention.  Further, the magistrate judge determined that

there was a genuine issue of material fact concerning whether Captain Lewis

caused the delay in treatment to Wade because a reasonable jury could infer that

Captain Lewis failed to notify medical staff about Wade's injury. And second, the magistrate judge concluded that our decision in *Aldridge* clearly established that Captain Lewis's actions would violate Wade's constitutional rights. Accordingly, the magistrate judge recommended denying Captain Lewis's motion for summary judgment.

The district court adopted the magistrate judge's R&R over Captain Lewis's objections. Captain Lewis timely appealed.

## II.    STANDARD OF REVIEW

We review the district court's denial of qualified immunity on a motion for summary judgment *de novo*. *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). We review the evidence in the light most favorable to the nonmovant. *Smith v. Fla. Dep't of Corr.*, 713 F.3d 1059, 1063 (11th Cir. 2013). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Smith*, 713 F.3d at 1063.

## III.    DISCUSSION

This appeal presents two questions. First, whether Captain Lewis's qualified immunity appeal revolves solely around a factual dispute such that we do not have jurisdiction to consider it. Second, if we do have jurisdiction, whether it was

clearly established that Captain Lewis's conduct violated Wade's constitutional rights.  We address each issue in turn.

### A.    Jurisdiction

Wade argues that we lack jurisdiction over this appeal because Captain Lewis asks us to resolve only factual disputes concerning the denial of his motion for summary judgment for qualified immunity, which is not an immediately appealable final decision.  According to Wade, Captain Lewis presents only factual challenges to the nature of Wade's injury, the extent of his subjective knowledge of the severity of Wade's injury, and the district court's failure to analyze other factors that caused the delay in treatment.  Captain Lewis responds that his appeal concerns an appealable issue of law about qualified immunity: whether the undisputed facts in the record showed a violation of clearly established law.  Captain Lewis is correct and, therefore, we have jurisdiction to hear his appeal.

"In general, 'we are . . . barred from entertaining appeals of non-final orders.'"  *Spencer v. Benison*, 5 F.4th 1222, 1229 (11th Cir. 2021) (quoting *Hall v. Flournoy*, 975 F.3d 1269, 1274 (11th Cir. 2020)); *see* 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . . .").  "But under the 'collateral order doctrine,' we may review some determinations, including certain denials of qualified immunity even though the underlying case is still ongoing in the trial

11

court." *Id.* (quotation omitted) (alteration adopted).  In particular, we may consider purely legal questions that "concern[] only the application of established legal principles to a given set of facts."  *Koch v. Rugg*, 221 F.3d 1283, 1296 (11th Cir. 2000) (quotation omitted); *see Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) ("[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment."); *see also Cottrell v. Caldwell*, 85 F.3d 1480, 1485 (11th Cir. 1996) (holding that we have jurisdiction when "the denial is based even in part on a disputed issue of law").  However, we lack jurisdiction over appeals that involve "only . . . issues of evidentiary sufficiency."  *Spencer*, 5 F.4th at 1229; *see also Cottrell*, 85 F.3d at 1485 ("[W]e lack interlocutory appellate jurisdiction . . . [when] the sole issues on appeal are issues of evidentiary sufficiency.").  An issue of evidentiary sufficiency arises "when a defendant's only challenge to the denial of qualified immunity is that the record did not contain sufficient facts to conclude that the defendant violated the plaintiff's rights."  *Hall*, 975 F.3d at 1275 (emphasis omitted).

Captain Lewis's appeal presents a pure question of law.  He does not challenge the district court's determination that genuine disputes of material fact precluded summary judgment on the question of whether he was deliberately indifferent.  Rather, Captain Lewis argues that the district court erred when it

12

determined that it was clearly established that his actions violated Wade's constitutional rights.  To that end, Captain Lewis relies on undisputed material facts in the record to show that his case is distinguishable from *Aldridge*—the only authority that the district court and Wade identify for the proposition that the law was clearly established.  Captain Lewis argues that, even if the undisputed facts are construed in a light most favorable to Wade, those undisputed facts distinguish this case from *Aldridge* and, thus, the district court erred in denying him qualified immunity on the ground that Captain Lewis's conduct violated clearly established law.  In other words, Captain Lewis's appeal "concerns only the application of established legal principles to a given set of facts."  *Koch*, 221 F.3d at 1296 (quotation omitted); *see also Plumhoff v. Rickard*, 572 U.S. 765, 773 (2014) (explaining that defendants "raise[d] legal issues" when they "contend[ed] that their conduct did not violate the Fourth Amendment and, in any event, did not violate clearly established law").  Accordingly, we have jurisdiction over Captain Lewis's appeal.

## B.    Clearly Established Law

Next, we address the central question raised in this appeal, namely: whether our decision in *Aldridge* clearly established that Captain Lewis's conduct violated Wade's constitutional rights.  Captain Lewis argues that key factual differences between this case and *Aldridge* demonstrate that the law was not clearly

13

established and, thus, he is entitled to qualified immunity.  Wade contends not only that this case is indistinguishable from *Aldridge*, but also that Captain Lewis's conduct was more egregious than that of the defendants in *Aldridge*.  For the reasons that follow, we agree with Captain Lewis and, therefore, we reverse the district court's decision.

The Eighth Amendment forbids "cruel and unusual punishments."  U.S. Const. amend. VIII.  A prison official's "deliberate indifference to serious medical needs of prisoners" constitutes cruel and unusual punishment.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  To establish an Eighth Amendment claim for deliberate indifference to a serious medical need, a plaintiff must satisfy three elements.  First, a plaintiff must show that he had an objectively serious medical need.  *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007).  Second, a plaintiff must show that a prison official acted with deliberate indifference to his serious medical need.  *Id.*  And third, a plaintiff must show that his injury was caused by a prison official's wrongful conduct.  *Id.*

Under the doctrine of qualified immunity, "government officials performing discretionary functions[] generally are shielded from liability [or suit] for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Echols v. Lawton*, 913 F.3d 1313, 1319

14

(11th Cir. 2019) (same).  The parties do not dispute that Captain Lewis was acting as a government official and carrying out a discretionary function.

"After a government official has demonstrated that the conduct at issue falls within the discretionary job responsibilities of the officer, a plaintiff must meet two requirements before qualified immunity may be rejected."  *Hall*, 975 F.3d at 1275.  First, a plaintiff must show "that the official violated [his] statutory or constitutional right."  *Echols*, 913 F.3d at 1319 (quotation omitted); *Hall*, 975 F.3d at 1275 (same).  Second, a plaintiff must show "that the right was 'clearly established' at the time of the challenged conduct."  *Echols*, 913 F.3d at 1319 (quotation omitted); *Hall*, 975 F.3d at 1275 (same).   Ordinarily, we decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Here, because the district court determined that genuine issues of material fact precluded summary judgment on the first prong of the qualified immunity analysis, we address only the question of whether a right was clearly established at the time of the challenged conduct.

Under the clearly established prong, the dispositive question is whether the law at the time of the challenged conduct gave the government official fair warning that his conduct was unconstitutional.  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) ("For a right to be clearly

15

established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." (quotation omitted) (alteration adopted)).  The "law is clearly established if the preexisting law dictates, that is, truly compels, the conclusion for all reasonable, similarly situated public officials that what Defendant was doing violated Plaintiffs' federal rights in the circumstances."  *Evans v. Stephens*, 407 F.3d 1272, 1282 (11th Cir. 2005) (en banc) (quotation omitted) (alteration adopted); *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) ("'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." (quotation omitted)).  Thus, we consider what an "objectively reasonable official must have known at the pertinent time and place" and ask "whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation the defendant officer confronted*."  *Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010) (per curiam) (quotation omitted) (alteration adopted).

A plaintiff can show that the contours of a right were clearly established in one of three ways.  First, a plaintiff can point to a "materially similar case that has already been decided."  *Echols*, 913 F.3d at 1324 (quotation omitted); *Goebert*, 510 F.3d at 1330 (same).  The case need not be "directly on point," but the "existing precedent must have placed the constitutional question beyond debate."

16

*Echols*, 913 F.3d at 1324 (quotation omitted) (alteration adopted). Additionally, because "judicial precedents are tied to particularized facts," *Corbitt*, 929 F.3d at 1312 (quotation omitted), "[m]inor variations between cases may prove critical," *Youmans*, 626 F.3d at 563. Second, a plaintiff can point to a "a broader, clearly established principle that should control the novel facts of the situation." *Echols*, 913 F.3d at 1324 (quotation omitted). But a broader principle "must establish with obvious clarity that in the light of pre-existing law the unlawfulness of the official's conduct is apparent." *Id.* (quotation omitted) (alteration adopted); *Goebert*, 510 F.3d at 1330 ("The more general the statement of law is that puts the official on notice, the more egregious the violation must be before we will find that the official is not entitled to qualified immunity."). And third, a plaintiff can show that "the conduct involved in the case may so obviously violate the Constitution that prior case law is unnecessary." *Echols*, 913 F.3d at 1324 (quotation omitted) (alteration adopted). "This narrow category encompasses those situations where the official's conduct lies so obviously at the very core of what the relevant constitutional provision prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." *Id.* at 1325 (quotation omitted).

Our analysis begins with *Aldridge*, which Wade asserts is a factually similar case that clearly establishes that Captain Lewis's conduct violated Wade's

17

constitutional rights.  In *Aldridge*, several defendant police officers "scuffle[d]" with the plaintiff during his arrest, resulting in a 1.5-inch cut above the plaintiff's right eye.  753 F.2d at 971.  The plaintiff was then placed in a county jail cell where the jailer, whose responsibility it was "to advise the officer in charge when someone might need medical treatment," informed the detective in charge that the plaintiff required medical care.  *Id.* at 971, 973.  Nevertheless, the officers ignored the plaintiff for two-and-a-half hours, during which time "[t]he cut continued to bleed, forming a pool of blood on the floor approximately the size of two hands." *Id.* at 971.  Later, the plaintiff was taken to the hospital where he received six stitches, and the doctors instructed the defendants to give the plaintiff icepacks and aspirin to treat the wound.  *Id.*  But the defendants never provided the icepacks or aspirin.  *Id.*

The plaintiff sued the officers under 42 U.S.C. § 1983, alleging that they were deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment.  *Id.* at 971–72.  The district court entered a directed verdict in favor of the defendants on the issue of deliberate indifference.  *Id.* at 971.  We reversed because "opposing contentions [on the issue of deliberate indifference] could not be resolved by a directed verdict." *Id.* at 973.

In subsequent years, we have read *Aldridge* as holding that a defendant is not entitled to a qualified immunity defense when he: (1) ignores a serious cut on

18

an individual's head, which continued to bleed for two-and-a-half hours and form a puddle on the floor about the size of two hands, or (2) ignores a doctor's instructions for treating an injury. *See Youmans*, 626 F.3d at 565 (noting that in *Aldridge* "we denied qualified immunity to a defendant who delayed treatment of a serious bleeding cut for approximately two and a half hours"); *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1318 (11th Cir. 2010) (describing *Aldridge* as "finding deliberate indifference whe[n an] inmate had [a] bleeding cut [above] his eye with treatment delayed for two and a half hours"); *McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999) (noting that *Aldridge* "revers[ed] [a] directed verdict to officers who failed to provide ice pack and aspirin for pain caused by [a] bleeding cut"); *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (explaining that *Aldridge* held that a "two and a half hour delay in treatment for a bleeding cut [above] the eye [was] actionable"). Accordingly, we must determine whether Captain Lewis's conduct is "materially similar" to the conduct of the defendants in *Aldridge*. *See Echols*, 913 F.3d at 1324 (quotation omitted).

Several critical facts materially distinguish this case from *Aldridge*. First, the nature of the injuries is different. In *Aldridge*, the plaintiff suffered an injury to his head—one of the most sensitive areas of the human body—whereas here, Wade suffered an injury to his hand. Considering that both cuts were about the same

19

size, the injury to a bodily extremity, such as Wade's hand, is less serious than the injury in *Aldridge*.

Second, there is a substantial difference between what the defendants observed about the plaintiff's wound in each case. In *Aldridge*, the defendants observed that the plaintiff continued to bleed for two-and-a-half hours while in their custody. Thus, their awareness of the seriousness of the injury increased over time and was readily apparent. Here, all that can be said is that Captain Lewis was aware that Wade's hand was still bleeding during a brief 10-minute escort to the SHU, at which point he left Wade in the custody of other personnel.[6] That is to say, Captain Lewis did not have the benefit of extended observation like the defendants in *Aldridge*.

Third, the quantity of blood is different. Although Wade testified that he told Captain Lewis that he was "leaking" an indeterminate amount of blood "all over" and leaving a "path of blood" as they walked, Wade has never alleged that

---

[6] Both the magistrate judge and the district court imputed to Captain Lewis knowledge of the broken bone and partially-severed tendon. That determination was error. Courts are to consider what an "objectively reasonable official must have known at the pertinent time and place." *Youmans*, 626 F.3d at 563; *id.* at 564 n.8 ("[T]he proper test is whether a lay person would easily recognize the need as serious. In addition, that a medical need might be recognizable by a trained medical professional, such as a nurse, is not enough. Instead, the need for immediate medical assistance must have been apparent to the untrained eye of a layperson."). An objectively reasonable officer who is not medically trained cannot diagnose such injuries while escorting a prisoner to a cell. Even Nurse Inniss, who was the first medical professional to examine Wade, did not recognize that Wade suffered from a broken bone and partially-severed tendon.

the blood soaked his clothing or pooled on the floor of the SHU cell, as was the case in *Aldridge*. To the contrary, by Wade's own admission, the blood was "tapering off" almost immediately after he and Captain Lewis completed their 10-minute walk to the SHU. Perhaps most importantly, it is undisputed that Captain Lewis left the SHU shortly after Wade arrived there and, thus, Captain Lewis did not observe a puddle of blood—a puddle that Wade never alleges even existed.[7] "Critical to our decision in [*Aldridge*] was that the plaintiff's cut bled continuously [for over two hours], causing blood to pool on the plaintiff's clothing and the floor." *Youmans*, 626 F.3d at 565. Those facts are critical also to our decision today because they are noticeably absent here.

Fourth, and finally, Captain Lewis left Wade under the supervision of other personnel who were equipped to treat Wade. Shortly after Captain Lewis and Wade reached the cell, other USP-Atlanta officers arrived, removed Wade's handcuffs, and took custody of him. Wade's holding cell was no more than three feet from the medical exam room where medical staff rendered medical care to SHU inmates. These circumstances stand in stark contrast to those in *Aldridge*,

---

[7] Although our analysis is limited to what an objectively reasonable officer in Captain Lewis's position would have known, we note that Wade never alleged that, after he reached the SHU cell and the blood began to "taper[] off," he continued to bleed for hours or that his blood pooled in the cell.

21

when the defendants were informed that the plaintiff required medical attention at a different location—a hospital—but ignored that need for two-and-a-half hours.[8]

Taking all these important factual distinctions together, we have no difficulty concluding that it would not have been clear to an objectively reasonable officer in Captain Lewis's situation that his conduct violated clearly established law. *See Youmans*, 626 F.3d at 563.

Our conclusion is strengthened by our decision in *Youmans*. In *Youmans*, the plaintiff was beaten in connection with his arrest for robbery, leaving "visible abrasions on his head, face, shoulder, elbow, and hand." 626 F.3d at 561. Plaintiff was then detained at a police station for four hours while officers interviewed and booked him. *Id.* During that time, the plaintiff complained of pain, "appeared to be disoriented," told officers he had "'cracked something' in his hand," reported blurred vision, and "blood was visible." *Id.* The plaintiff was later taken to a

---

[8] Captain Lewis correctly notes that the reason for a delay in medical treatment might be relevant in determining whether the law was clearly established. In the deliberate indifference inquiry, "[t]he tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay." *Harris v. Coweta Cnty.*, 21 F.3d 388, 393–94 (11th Cir. 1994); *see also Youmans*, 626 F.3d at 564 (noting that "the reason for the delay must weigh in the [deliberate indifference] inquiry"). Thus, a defendant might be able to show that his case is materially distinguishable from a prior case that held that a delay in medical treatment was intolerable and amounted to a constitutional violation in a particular factual scenario. Here, Captain Lewis argues that the delay was justified by the fact that USP-Atlanta was on lockdown, officers had to secure 250 inmates, and prison officials had to tend to Wade's victim. But the record evidence does not establish whether these considerations played a role in the delay in treatment of between two-to-seven hours. Without knowing more, we decline to consider the reason for the delay in our analysis.

hospital where he was diagnosed with "with injuries consistent with blunt trauma" and prescribed medications and scheduled for follow-up treatment. *Id.* at 562. The plaintiff later sued the officers for deliberate indifference. In reversing the district court's denial of qualified immunity and analyzing whether there was clearly established law, we distinguished *Aldridge*. We explained that in *Aldridge*, "we denied qualified immunity to a defendant who delayed treatment of a serious bleeding cut for approximately two and a half hours." *Id.* at 565. And we noted that "[c]ritical to our decision in that case was that the plaintiff's cut bled continuously during that time, causing blood to pool on the plaintiff's clothing and the floor." *Id.* We then explained that:

> [n]othing in the record in the present case shows that Plaintiff's cuts bled while in Defendant's custody . . . . Significant, sustained bleeding requiring later stitches is a far greater indicator of a need for urgent medical care than the mere presence of cuts and bruises as in the present case. This factual variance is the kind of variation between cases that makes a critical difference in determining whether the applicable law was already clearly established at the time the occurrence underlying this case arose. We cannot say that *Aldridge* would provide an objective police officer with adequate advance notice that the conduct at issue in this case would violate Plaintiff's constitutional rights.

*Id.* at 565–66 (internal citation omitted). Although Wade's cut was bleeding while he was in Captain Lewis's custody, nothing in the record supports the inference that, during Captain Lewis's brief interaction with Wade, Wade's cut bled so continuously or profusely that it rose to the level of the circumstances in *Aldridge*.

23

Thus, the facts "[c]ritical to our decision" in *Aldridge* were absent in *Youmans* and are absent here.[9]

Wade argues that, even apart from *Aldridge*, the law was clearly established at a higher level of generality. Specifically, he submits that on the date of his injury, it was clearly established that "[u]nder the Eighth Amendment, prisoners have a right to receive medical treatment for their illnesses and injuries." *Taylor v. Hughes*, 920 F.3d 729, 732–33 (11th Cir. 2019) (citing *Estelle*, 429 U.S. at 104). By pointing to "a broader, clearly established principle that should control the novel facts of the situation," Wade has the burden of showing that the broad principle established "with obvious clarity that in the light of pre-existing law the unlawfulness of the official's conduct is apparent." *Echols*, 913 F.3d at 1324 (quotation omitted) (alteration adopted); *cf. Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000) ("[A] plaintiff must show that the official's conduct was so far beyond the hazy border between excessive and acceptable force that the official had to know he was violating the Constitution even without caselaw on point." (quotation omitted) (alteration adopted)). Wade cannot meet his burden

---

[9] Wade contends that this case is more "egregious" than *Aldridge* because he suffered a broken bone, partially torn tendon, bacterial infection, and required surgery. We reject this argument for two reasons. First, the relevant question is what was known by an objectively reasonable officer in Captain Lewis's situation, and there is no evidence that he was aware of the extent of Wade's injury. And second, as we have explained, Wade's injury was less severe than the injury in *Aldridge*.

here. Nothing about this case suggests that it is "obvious" that Captain Lewis violated Wade's "right to receive medical treatment for [his] . . . injur[y]," *Taylor*, 920 F.3d at 732–33, when he escorted Wade for 10 minutes to the SHU cell located three feet from a medical examination room and left him in the custody of other officers.

*        *        *

In determining whether the law was clearly established for purposes of qualified immunity, we have explained that "judicial precedents are tied to particularized facts," *Corbitt*, 929 F.3d at 1312 (quotation omitted), and "[m]inor variations between cases may prove critical," *Youmans*, 626 F.3d at 563. Thus, district courts are obliged to analyze carefully whether "preexisting law dictates, that is, truly compels, the conclusion for all reasonable, similarly situated public officials that what Defendant was doing violated Plaintiffs' federal rights in the circumstances." *Evans*, 407 F.3d at 1282 (quotation omitted) (alteration adopted). Here, the district court failed to undertake this careful analysis, and *Aldridge* does not clearly establish that Captain Lewis violated Wade's constitutional right. Accordingly, Captain Lewis is entitled to qualified immunity.

## IV.  Conclusion

For these reasons, we reverse the district court's order denying Captain Lewis's motion for summary judgment on the ground that he is entitled to qualified immunity.

**REVERSED.**

TJOFLAT, Circuit Judge, concurring:

I agree with the court that defendant Lewis is entitled to qualified immunity, but I write separately to highlight why we have jurisdiction over this appeal and to suggest that the qualified immunity analysis is simpler than the court suggests.

When a district court denies qualified immunity on a summary judgment motion, this Court has jurisdiction over that appeal "to the extent that it turns on an issue of law" because it "is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291." *Hunter v. City of Leeds,* 941 F.3d 1265, 1271 n.2 (11th Cir. 2019) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S. Ct. 2806, 2817 (1985)).  In reviewing such an appeal of qualified immunity, we "review the denial of summary judgment based on qualified immunity *de novo*, viewing the facts in the light most favorable to the nonmovant." *Id.* at 1274 n.8 (citing *Salvato v. Miley*, 790 F.3d 1286, 1292 (11th Cir. 2015)).

In this case, Wade is the nonmoving party, so we are required to draw all factual inferences in his favor.  We do that to create a "purely legal question." *Mitchell*, 472 U.S. at 530, 105 S. Ct. at 2817.  The record contains the following relevant facts: 1) Wade broke a bone in his hand and had an accompanying laceration spanning 1.34 inches; 2) Lewis escorted Wade on a ten-minute walk to the Special Housing Unit ("SHU"), and Wade's hand bled on the entire walk; 3)

When Wade asked Lewis if they were going to go to the medical unit on this walk, Lewis said something to the effect of, "Don't tell me how to be a captain, and I won't tell you how to be an inmate;" 4) Once in the SHU, Lewis handed Wade over to an officer who removed Wade's handcuffs; and 5) Lewis left the scene. Although Wade tries to create a factual dispute here in order to defeat our jurisdiction, none exists, because Lewis does not dispute these facts. And it is worth noting that a factual dispute will *never* exist in this context, where an officer appeals a denial of qualified immunity based on the clearly established prong and not on the sufficiency of the evidence. This is the case because we, as the reviewing court, will always take the facts in the light most favorable to the nonmoving party when analyzing the clearly established prong, regardless of how an officer tries to color them.[1]

Wade tries to create factual disputes in this case by saying that Lewis "downplays the severity" of Wade's injury, Lewis "challenges the extent of his subjective knowledge," and Lewis "questions the reason why he refused to provide access to the requested medical attention." Wade characterizes these supposed factual disputes as "challenges to the district court's factual determinations." Wade's characterization of Lewis's arguments is wrong. In order to perform an

---

[1] At this stage of litigation, we are not concerned with what Wade might ultimately be able to prove at trial. *Hunter*, 941 F.3d at 1277 n.15. The question is whether, if we view all the facts in Wade's favor, they demonstrate that Lewis violated a clearly established right. *See id.*

28

analysis of the clearly established prong of qualified immunity, Lewis had to evaluate the facts of the case, and nothing Lewis said contradicted the District Court's factual findings. Moreover, even if Lewis had tried to downplay or contradict the facts as established by the District Court, we would still take the version of facts most favorable to Wade and thereby create a pure question of law. All that is left to decide based on these facts, then, is whether Lewis is entitled to qualified immunity.

Turning to the qualified immunity analysis, the court distinguishes *Aldridge* on four grounds to hold that the right was not clearly established here. I agree that Lewis is entitled to qualified immunity, but I write separately to highlight the fact that Lewis's role in this incident as reflected in the record is what best differentiates this case from that of the liable officers in *Aldridge*.

Facially, there are some similarities between *Aldridge* and this case. The plaintiffs in both cases sustained bleeding injuries and went without medical assistance for hours in officers' custody. *See Aldridge v. Montgomery*, 753 F.2d 970, 971 (11th Cir. 1985) (per curiam). The court differentiates this case from *Aldridge* on four grounds: 1) The plaintiff in *Aldridge* had a head injury while Wade suffered a hand injury; 2) the defendants in *Aldridge* observed the plaintiff bleeding for two hours while Lewis's walk with Wade only lasted ten minutes; 3) the plaintiff in *Aldridge* bled more than Wade; and 4) the defendants in *Aldridge*

29

neglected to take the plaintiff to the hospital for over two hours while Lewis left Wade under the supervision of other officers who could treat Wade.

While I appreciate the court's thorough analysis of *Aldridge*, this case can be distilled to one simple point. The key difference between these cases in my estimation is not necessarily where the injury was or how much the inmate bled over the course of the day, but instead *who* is being sued and under what theory of law. Wade is not suing the officers who kept him in custody for hours without medical treatment, like the plaintiff in *Aldridge*. He is suing Lewis, who escorted him from the dining hall area to the SHU, located right next to the medical unit, where Lewis then handed Wade over to other officers. Narrowing our focus from the time Lewis entered the scene to the time he left Wade in other officers' custody, the time period for which there is an utter lack of evidence in the record, we have no facts from which to draw inferences in Wade's favor. There is no evidence in the record that Lewis did anything more than escort Wade to the SHU. The dialogue between the two on the walk as reflected in the record certainly does not indicate that Lewis violated a clearly established right. And Wade has pointed to no other case to establish that Lewis is not entitled to qualified immunity. Lewis is entitled to qualified immunity, not because this case is so much different from *Aldridge* on the facts, but because there are no facts in the record suggesting that this particular defendant is liable.

30